George HICKS, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–81–0224–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

March 11, 1982.

Discretionary Review Refused
June 16, 1982.

Russell C. Busby, Amarillo, for appellant.

John L. Owen, Amarillo, for appellee.

Before EVANS, C. J., and DOYLE and BASS, JJ.

DOYLE, Justice.

The appellant was convicted of murder and sentenced to 99 years confinement in the Texas Department of Corrections. The trial which was in Houston, was the second time the appellant had been tried for the offense of which he was finally convicted. The first trial was in Potter County, Texas, where the offense occurred. The court there declared a mistrial when the jury was unable to reach a decision concerning the appellant's guilt. Thereafter, upon a change of venue, the trial was held in the 180th District Court of Harris County.

Twelve grounds of error are asserted by the appellant, some of which are multifarious. In ground one, the sufficiency of the evidence is challenged. A summary of the testimony shows the following facts.

Jerry Don Gipson testified that, approximately three weeks preceding the murder of Frank Potts, he was approached by appellant, the common-law husband of Gipson's sister, Bedale Hicks, and offered the enticing prospect of making "big money." Gipson initially perceived that appellant was endeavoring to secure his services in relocating in Amarillo, as appellant and Bedale were then residing with the parents of Bedale and Gipson. Gipson soon realized that appellant was attempting to enlist him in a scheme to murder a man in Barney's Clothing Store in downtown Amarillo. The design of the undertaking was unfurled by appellant: the murder was to assume the guise of a robbery, the deed was to be perpetrated with a knife, the pockets on the clothing of the victim were to be turned inside-out, the body was to be stripped of all jewelry and escape was to be afforded through the rear door of the store, arranged to be left open, then by exiting into an alley, where a vehicle would be waiting to spirit him away. Remuneration was contemplated as being the cash and any other items to be taken from the store, at the discretion of Gipson, the intended perpetrator, and ultimately a $700 cash payment from insurance company proceeds, to be conveyed by an attorney. Gipson feigned mild interest in the scheme to the end that appellant loaned him $5. The conversation was held on the front lawn of Gipson's aunt's residence, within hearing distance of Tommy Lee Hill, but Gipson was unclear whether Hill was cognizant of its tenor.

The following day, appellant again approached Gipson at the same location and renewed his offer respecting Gipson's participation in the projected murder. Appellant attempted to assuage any apprehension respecting the risks involved by disclosing that the scheme was "an inside job," that one of the principals of the business would leave the other alone in the store at the appointed time (around lunch time), that appellant would furnish the murder weapon, if necessary, and that a ride would be waiting behind the back door. Gipson declined to participate.

On the evening of October 8, 1977, Gipson, in the company of his cousin, Tommy Lee Hill, and their respective girlfriends, saw a television newscast reporting the murder of Frank Potts at Barney's. Apprehending that appellant and Bedale were implicated, the foursome proceeded to Gipson's mother's house where they found Bedale lying on a bed in their bedroom, nursing a cut on her leg and being attended by appellant. In response to Gipson's inquiry, Bedale stated that appellant had cut her, evoking an admonishment to her from appellant to "be cool." Gipson further probed into their involvement in the murder, but pursuit of the matter was deterred by appellant's retort that Gipson "asked too many questions." Sensing a developing argument, Gipson left.

Approximately one month following the murder, Gipson encountered Bedale at an Amarillo nightspot, and in response to his foreboding about her accountability, was assured by her that risk of apprehension was minimal, as this was an "inside job" which went too smooth, and that she and appellant had payment coming for their services.

After disclosing that he had not heard the first conversation between appellant and Gipson respecting the contemplated murder, Tommy Lee Hill recounted, in essential conformance to Gipson's testimony, the substance of the second effort by appellant to induct Gipson into the undertaking. The projected murder was characterized as an inside job, the back door was to have been left open by one of the operatives, after the victim was left isolated inside the store. Payment of the contracted sum of $700 would be derived from insurance proceeds.

Kathryn "Jackie" Wilson testified that she had developed an amicable relationship with the deceased and Kevin Francis, as she was operating a retail business adjacent to Barney's at the time of its establishment. During the spring and summer months, when sales were brisk and several employees were available to attend to customers, Mrs. Wilson once accompanied Kevin Francis to lunch, and both partners lunched together on another occasion. Business thereafter rapidly deteriorated. However, and on October 8, 1977, only she and the two partners were manning the store. On October 8, Frank Potts first went to lunch. Upon his return, Francis and Mrs. Wilson proceeded to the Pizza Planet and returned an hour later to discover the store cordoned off by police.

Pauline Potts, the widow of the murder victim, testified that business had declined to an abysmal state by October 8, 1977. She was cognizant of a "key man" insurance policy contracted by the partners in the amount of $175,000, and related that her husband had scheduled a physical examination the day following the murder in connection with the policy. She recounted that her husband had arrived home for lunch shortly before 12:00 p. m. on October 8, and that he left shortly before 1:00 p. m. to return to the store. A few moments following his departure, Francis telephoned, inquiring as to whether Potts was still there; Mrs. Potts stated that her husband had left moments before.

Reverend Melvin Martin testified that at about 1:00 p. m. on October 8, he, his wife and son entered Barney's for the purpose of applying a payment toward a suit he was purchasing on a layaway plan. A black man approached him from the rear of the store, exchanged casual greetings and mentioned that the proprietors would return in short order. He observed a black woman on her knees in a corner, in close proximity

to a counter. Upon noting the presence of Reverend Martin, the woman jumped up, pulled her coat together, approached and repeated the black man's forecast of the proprietors' imminent return. Reverend Martin articulated his intent to browse, pending the availability of a store employee, and shortly became cognizant that he and his family were alone. He proceeded to the rear of the store, made the grisly discovery of Potts' body, directed his wife to summon the police, ran out the rear exit and observed the black couple seen in the store moments before, strolling down the alley. He then ran to the front of the store and caught the attention of a passing police patrol car. He recounted the numerous line-ups and photographs reviewed during the course of the investigation. While allowing that he was never able to make a positive identification of either the man or the woman seen in the store to a moral certainty, he discerned a close resemblance of a man in one lineup to the man seen the day of the murder; he later learned that the man so indicated was appellant. Reverend Martin testified that appellant "bears a strong resemblance" to the man seen by him. He explained his failure to mention an "Afro" wig and blue denim cap donned by the woman and man, respectively, in contradistinction to his testimony in the statement he gave police the day of the murder, as being an oversight occasioned by the shock of what had transpired.

Joyce Martin testified to essentially the same events developed through the testimony of her husband, Reverend Martin. While never being able to positively identify any of the males viewed by her in numerous arrays of photographs and lineups, she pronounced that appellant has a "strong resemblance" to the man seen in the store. She unequivocally identified Bedale Hicks, however, as the woman seen on the fateful occasion. She maintained on cross-examination that her identification of Bedale Hicks was a certainty owing to the distinguishing features of her face and complexion. As did Reverend Martin, she attributed cosmetic variances between the physical descriptions of the suspects in her statements to the police and her testimony to the unnerving effect of the discovery.

Pathologist Dr. Jose Diaz-Esquivel testified that on October 8, he performed an autopsy on Frank Potts' body, wherein a total of 23 stab wounds, and combination stab and lacerating wounds, primarily to the neck and upper chest areas, were observed. It was noted that, while two ear-to-ear lacerations found on the neck eventually would have killed him, death was attributable primarily to the collection of blood in the sac surrounding the heart and in the left lung caused by three stab wounds, perceived as "compatible" with a knife being the causative force.

Michael Crandall, an Amarillo, Texas, police officer, testified that shortly after 1:00 p. m. on October 8, he heard on the police radio in his patrol unit a directive to another unit to proceed to Barney's. He resolved to proceed to the location as well, as the directive was couched as a "disorderly conduct" call and he understood that the officer dispatched to the scene would require assistance. As he approached the store, he was summoned by the visibly shaken Reverend Martin. He described the scene encountered upon his arrival and noted that Potts' pockets were turned inside-out and that no wallet was found. Photographs of the scene were received into evidence contemporaneously with his testimony.

Amarillo police officer William Ottoson, who received the initial dispatch, arrived at Barney's within moments of Officer Crandell. He testified that coat hangers, a pocket comb, and a pair of eyeglasses were strewn about the immediate area where the body was found.

Julian Gibson, who, during the governing time frame, was an identification technician at the Amarillo Police Department, testified that he performed a series of 24 "lifts" of fingerprints, all excepting one from the display counter next to Potts' body. Of these lifts, five were determined to be of value, i.e., admitting of identification or correlation with known prints. He testified that all lifts, including those represented by

State's Exhibits 11 through 15, were forwarded to the Department of Public Safety Laboratory in Austin, Texas, and the Federal Bureau of Investigation laboratory in Washington, D.C.

Charles Hedrick, in his capacity of processing prisoners in the Potter County Jail, obtained the fingerprints of appellant on an F.B.I. card, which was received into evidence.

Claude Stephens, identified as a latent fingerprint expert employed by the Texas Department of Public Safety, obtained fingerprint and palm impressions from appellant on November 13, 1979. These prints were compared by him with the prints received into evidence as State's Exhibit 11–4 and determined to be identical.

Carolyn Edelen, a fingerprint specialist employed by the F.B.I. similarly compared State's Ex. 14 with the known print secured by Charles Hedrick. Noting that, in her judgment, 7 or 8 points of identity typically are required to conclusively attribute a latent print to an individual, she discerned at least 14 points of identity in her comparison, and testified that the latent print was appellant's.

Appellant did not testify. Evidence proffered in his behalf included most prominently the alibi testimony of Lillie Mae Moore. She related that appellant and Bedale were at the Moore home on the day of the murder when she and her husband traveled to downtown Amarillo between 12:30 and 1:00 p. m., in their only operable vehicle, to take appellant's mother from a bus stop to her home; that upon their arrival downtown she observed a fire truck at Barney's and was told by a passerby that a man had been murdered; and that, failing to find appellant's mother at the bus stop, she telephoned home at approximately 2:00 p. m. from a business establishment to ascertain whether appellant's mother had endeavored to contact her, and thereupon conversed with Bedale; and that nothing unusual about the appearance of Bedale and appellant was detected upon the Moores' return home at approximately 5:00 p. m. following a trip to Hereford, Texas. Other evidence adduced in appellant's behalf was the impeachment testimony of Lillie Mae Moore; Albert Lee Gipson, Jerry Don Gipson's father, Amarillo police officers Darrell Garner and A. L. Morris and former Assistant 47th District Attorney, Richard Stokes, regarding the reputation in the community for truth and veracity of State's witnesses Jerry Don Gipson and Tommy Lee Hill.

In his first ground of error the appellant raises several claims. First, he questions the sufficiency of the evidence to support a conviction and then he questions the sufficiency of the indictment itself to describe the alleged wrong. The second contention is without merit, because, although the appellant entered a motion to quash the indictment, the motion did not question the sufficiency of the indictment to allege the crime. It questioned only the actions of the grand jury. *Parr v. State*, 575 S.W.2d 522 (Tex.Crim.App.1978); Tex. Code Crim.Pro.Ann. art. 27.09 (Vernon 1966).

In reviewing a circumstantial evidence case on appeal, the test is whether there was evidence from which the jurors, having been advised of the restrictions the law places on circumstantial evidence, might reasonably conclude that every reasonable hypothesis other than the defendant's guilt was excluded. *Flores v. State*, 551 S.W.2d 364 (Tex.Crim.App.1977).

From the testimony set out above, especially that of Reverend and Mrs. Martin as to the "strong resemblance" of the appellant to the man in the store where the murder had just occurred, Mrs. Martin's positive identification of appellant's wife as the woman they met in the store, and the testimony of Jerry Don Gipson as to the scheme for the "inside job," the jury had ample evidence to support its verdict of guilty.

Appellant's first ground of error is overruled.

The appellant charges in his second ground of error that the trial court committed reversible error when it allowed Jerry

Don Gipson, the appellant's brother-in-law, to testify concerning an inculpatory statement made by the appellant's wife. When Gipson asked his sister (the appellant's wife) whether she and the appellant were implicated in the murder of Frank Potts, she told him that "he [the appellant] treats her real good and that they had been paid good money for the job downtown at the clothing store, and she said this lawyer Jim Durham had paid her good, and another guy that—oh yeah, that they still had money coming, and she said that don't worry about them getting caught because it was an inside job, went too smooth."

When the subject of the conversation was initially brought up by the State the appellant objected and asked the court to note his exception to its ruling. The appellant neglected to object again, however, when Gipson revealed precisely what his sister said to him in their conversation. By neglecting to object the second time, the appellant waived any review on appeal to the testimony given by Gipson. See *Brown v. State*, 457 S.W.2d 917 (Tex.Crim.App.1970) and *Fennell v. State*, 460 S.W.2d 417 (Tex.Crim. App.1970). The second ground of error should be overruled.

The appellant claims in his third ground of error that the trial court committed reversible error by refusing to grant the appellant's motion for continuance based on a denial of access of the appellant's attorney to the appellant.

The record reveals that the appellant was in Amarillo from the time that his attorney was appointed in July, 1979 until May 1, 1980, only twelve days before the trial, when the appellant was taken to the Harris County jail. The cases in which the properness of rulings on motions for continuance have been discussed uniformly hold that such a motion, when based on equitable grounds, is subject to the discretion of the trial court. *Coleman v. State*, 481 S.W.2d 872 (Tex.Crim.App.1972). In *Coleman*, the court stated that it "... will not overturn the decision of a trial court concerning a motion for continuance unless a clear abuse of discretion is shown."

In the present case, counsel had from the middle of November 1979, until May 1, 1980, to consult with his client. Although counsel testified that he had decided to change tactics and that he needed to consult with the appellant, he had not discussed the change with the appellant before the appellant's removal. No new witnesses had been subpoenaed by the State. Counsel was trying the same case, with all of the same witnesses, for a second time. Also, the State offered to pay for counsel's air transportation from Amarillo to Houston anytime during the twelve day period between the day the appellant was removed to Houston and the day the trial began, should counsel desire to confer with the appellant.

Appellant's third ground of error is overruled.

The appellant claims in his fourth ground of error that the trial court erred in refusing to grant his timely written objection to the court's jury charge informing the jury on the law of parties.

The Court of Criminal Appeals discussed in *Pitts v. State*, 569 S.W.2d 898 (Tex.Crim. App.1978) the requisites for a charge on parties. The court stated that a court may give a charge on the law of parties, even though there is no such allegation in the indictment, if the evidence supports a charge on the law of parties.

§ 7.01 of the Penal Code defines a party as one who is criminally responsible if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. One is criminally responsible if, "acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

There was testimony by several people that placed both the appellant and his wife suspiciously at the scene of the crime before the murder had been discovered. There was testimony by Gipson which indicated that the appellant and his wife, along with one of the partners of the store, were involved in a scheme to kill Frank Potts.

There was testimony by a friend of Gipson that the appellant was conniving with others to kill Frank Potts.

Appellant's fourth ground of error is overruled.

■ In the fifth ground of error, the appellant raises two related, but distinct points. First, he claims that the trial court erred in refusing to allow Richard Stokes to give impeachment testimony concerning the key state witnesses, Jerry Don Gipson and Tommy Lee Hill, who had previously lied under oath. Next the appellant claims that he should have been allowed to cross-examine Gipson and Hill about the false statements they made under oath.

The appellant claims that it was important to put the evidence concerning Gipson's and Hill's previous fabrication under oath before the jury because it showed a willingness on the part of the witnesses to "interfere with the discovery of truth by fabricating false testimony." In short, the appellant believes that the evidence would have negatively affected the witness' credibility.

The scope of impeachment is narrow, and purposefully so, because impeachment evidence is found in most cases to have only limited value. The Court of Criminal Appeals discussed the Texas rule concerning impeachment evidence in *Murphy v. State*, 587 S.W.2d 718 (Tex.Crim.App.1979). The court was confronted with a claim similar to the appellant's and said that the threshold question in such an instance is for the court to decide whether the credibility of the appellant and his witness is a material issue in the trial. The court decided that the credibility of the witnesses in the case before them was not a material issue and continued to the conclusion that "an issue regarding the general credibility of a witness in a criminal trial is not a material issue in the sense that it will justify the admission of inherently prejudicial evidence of details of an extraneous offense committed by the witness." *Id.* at 722. *See also, Shipman v. State*, 604 S.W.2d 182 (Tex. Crim.App.1980).

The impeaching testimony the appellant wanted revealed to the jury was that Hill and Gipson lied once before in a judicial proceeding. The Court asked the appellant why the testimony should be admitted and he said that it indicated the witnesses' tendency for untruthfulness. When the Court then questioned the propriety of allowing testimony for such a purpose, the appellant attempted to distinguish between evidence tending to show an inclination to always prevaricate and evidence tending to show that, for purposes of the present trial, the witness will fabricate a story.

The evidence clearly concerns extraneous statements, for which the witnesses were never prosecuted and which were retracted before the end of the trial in which they were made. Further, there was impeachment testimony as to Hill's and Gipson's bad reputation for truth and veracity from Gipson's parents, two police officers from the Amarillo Police Department, a lieutenant and a homicide detective, and an assistant district attorney.

The fifth ground of error is overruled.

■ The next six grounds of error, each of which pertain to alleged statutory violations of the code requirements for grand jury operations, will be discussed together. None of the violations is of such a nefarious nature to warrant a reversal of the case. This is particularly so since it appears that some of these articles are directory rather than mandatory and since none involve fundamental errors. *King v. State*, 90 Tex.Crim.R. 289, 234 S.W. 1107, 1108 (1921).

Basically, the appellant claims that the trial court should have sustained his motion to set aside the indictment because the names of the prospective grand jurors were returned in violation of articles 19.09–19.12 of the Code of Criminal Procedure. Art. 19.09 requires the grand jury commissioners to return the names of the grand jurors in open court. Art. 19.10 requires the judge to deliver the list of grand jurors to the clerk. Art. 19.11 requires that the judge, before delivering the list of grand jurors to the clerk, administer to the clerk and his depu-

ties in open court an oath in which they swear not to open the list before the proper time. Art. 19.12 requires that the clerk administer an oath to any deputy clerk.

The purpose of the grand jury statutory requirements is to avoid fraud in the selection of the grand jury and to assure that the composition of the grand jury is a diverse one. Although there seems to have been some violation of articles 19.09–19.12 when the indictment was returned in Potter County, the appellant does not claim that any fraud occurred in this initial selection process described in arts. 19.09–19.12, and neither fraud nor injury is shown to have resulted from the "loose" procedure used by the county.

These grounds of error are overruled.

■ In grounds of error seven through twelve, appellant complains of various improprieties committed by the grand jury through the actions of its foreman and members in holding private meetings, making tape recordings and having discussions with witnesses outside of official sessions.

Article 20.01 of the Code of Criminal Procedure, entitled "Grand Jury Room," states that the grand jury "shall proceed to the discharge of their duties in a suitable place which the sheriff shall prepare for their sessions."

At the time this indictment was returned, there seems to have been some political turmoil in Potter County and evidently the grand jurors believed that the district attorney was not expending his full effort in finding a suspect in the Pott's murder. Consequently, the grand jury consulted with the Attorney General of Texas several times and finally decided to totally exclude the district attorney from the meetings and to ask the county attorney to take his place.

Testimony in the trial at Potter County reveals that the foreman of the grand jury asked the county attorney and assistant county attorney to come to his office for an orientation on the Potts case. It also shows that the foreman told several of the grand jurors about the meeting, suggesting that they drop by if they wanted. Several of

the grand jurors intermittently went to the foreman's office but none stayed long. No injury appears to have resulted from this "meeting" and none is claimed. Furthermore, the Code of Criminal Procedure permits the county attorney to be present at the grand jury hearings at all times except during deliberations. See, Tex.Code Crim. Pro.Ann. article 20.03. We fail to see how this meeting between the grand jury foreman and county attorney could constitute grounds for quashing the indictment. Nor can we conclude that the discussion between Parker, a member of the grand jury, and Gipson, a State's witness, was a meeting of the grand jury. Gipson went to Parker's house to borrow money. While he was there Parker asked him a few questions. Once again, no fraud is claimed and no injury is asserted. More importantly, it is questionable whether this occasion or the one above could be considered a meeting of the grand jury.

■ In ground of error eight the appellant complains of two things which he claims violated the requirement that grand jury proceedings be kept secret: 1) sessions of the jury were taped for absent jurors and 2) two witnesses were simultaneously before the grand jury. This ground of error is overruled.

Initially, we observe that the record is silent on whether any portion of any witness's testimony concerning the Hicks case, was tape recorded by anyone. There was some testimony that during his period of service on the 47th district grand jury, Jerry Huff had made some tape recordings of witnesses appearing before it, there is no proof that any of these were witnesses in the Hicks case.

The State cites *Zapata v. State,* 493 S.W.2d 801 (Tex.Crim.App.1973) as authority for its rebuttal of this ground of error. Although the court in *Zapata* merely touched on the issue of whether taping a grand jury session violates art. 20.02 of the Code of Criminal Procedure, it did spend enough time on the subject to say two things: 1) It implied that there was no violation of the statute merely by virtue of

there being in existence a recording of the grand jury session, and 2) It stated that even if recording a grand jury session violates the statute, such would not be reversible error when no one heard it. The case at bar is very similar to the *Zapata* case, for although a few people heard the recordings, they were members of the grand jury. Since the secrecy of the meetings was still intact, no harm resulted.

■ The appellant also claims the secrecy of the meetings was violated because two witnesses—the appellant's wife and Gipson, her brother—were in the grand jury room at the same time. The testimony concerning this ground of error is conflicting, mainly because it is difficult to understand what the appellant's wife (Bedale Hicks) said. At one point she seems to say that her brother was with her in the grand jury room for only one half minute or so; a little later she seems to say that they were in the room together and that both were answering questions. She did, however, unequivocally say that she did not hear any of Gipson's answers.

Regardless of whether they were actually in the courtroom together, the courts have required one to show that an unauthorized person was in the grand jury room, not only when testimony was given, but during deliberations, in order to have an indictment quashed. *Sims v. State,* 39 Tex.Cr.R. 139, 45 S.W. 705 (1898); *Lopez v. State,* 158 Tex.Cr.R. 16, 252 S.W.2d 701 (1952), cert. denied 344 U.S. 893, 73 S.Ct. 213, 97 L.Ed. 691. There was no such showing in this case.

In his final ground of error, appellant complains of the impropriety of the certain meetings of the judge and the county attorney with the grand jury. These complaints involve procedural, rather than substantive matters. Appellant points out no instance of harm by any of the discussed irregularities, nor can we find any abuse of discretion.

■ Finally, the appellant questions the variance between the language in the indictment and the language in the charge, claiming that the variance amounts to reversible error. It was stated in the indictment that the appellant did "intentionally *and* knowingly...," whereas the judge changed the wording in his charge to "intentionally *or* knowingly..." The Court of Criminal Appeals discussed a claim exactly like the appellant's in *Hammett v. State,* 578 S.W.2d 699, 713 (Tex.Crim.App.1979), stating that the change was of no consequence.

We overrule all of appellant's grounds of error.

The judgment of the trial court is affirmed.