**Kenneth GENTRY, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69869.

Court of Criminal Appeals of Texas,
En Banc.

Nov. 23, 1988.

Rehearing Denied Dec. 14, 1988.

Certiorari Denied June 5, 1989.
See 109 S.Ct. 2458.

Thomas W. Whitlock, on appeal only, and Richard S. Podgorski, Denton, for appellant.

Jerry Cobb, Dist. Atty. and Gwinda Burns, Asst. Dist. Atty., Denton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DUNCAN, Judge.

The appellant was convicted of capital murder under V.T.C.A.Penal Code, § 19.03(a)(2). The death penalty was imposed after the jury affirmatively answered the special issues submitted under Article 37.071(e), V.A.C.C.P. The appellant urges seven points of error. We affirm.

The appellant, Kenneth Gentry, and the deceased, Jimmy Don Ham, became acquainted when the appellant gave Ham, who was hitchhiking, a ride into the Denton area. At the time, the appellant was wanted by the authorities in connection with several prior offenses, including an escape from a Georgia prison. After a brief visit in Denton, the appellant and Ham left Texas, along with the appellant's girlfriend and sister. They travelled to Georgia, where the two men committed an armed robbery. The foursome then moved on to Florida, then back to Texas, to Oklahoma, and then came back to the Denton area, where Ham's body was later discovered.

According to the testimony adduced at trial, approximately two days prior to the offense, the appellant posed the following hypothetical question to Harold Loftin, his uncle: "If you was [sic] going to dispose of somebody, how would you do it?" Loftin obligingly replied, "I would find the most wooded, most deserted area I could find and that's where I would do it ... because I love the woods." The appellant's sister overheard the conversation between the appellant and his uncle, and testified to the

effect that her brother was seeking a new identity at that time. Linda Patterson, appellant's girlfriend, testified that the appellant told her he intended to assume the identity of Jimmy Don Ham and find work in another state.

On the date of the murder, September 10, 1983, the appellant and his travelling companions (sister Violet Ann; girlfriend Linda and Ham) arrived at the trailer home of the appellant's friend, Charles Goodman. Also present were the appellant's two brothers, Calvin and Larry Gentry. According to the testimony, at one point, when Ham left the room for a few moments, the appellant announced: "There goes my new I.D." A short time later, a police car was seen driving down the road adjoining Goodman's property. The appellant's sister, aware that her brother was wanted by the Georgia authorities for his prison escape and for the robbery he committed with Ham, ran to warn the two men. Momentarily, the appellant and Ham left in one vehicle, with appellant's two brothers following in a truck.

According to the testimony admitted before the jury, during the time the offense was to have occurred, Calvin Gentry, appellant's younger brother, testified that he and his brother Larry went to a local pool hall and "shot pool for about two, three hours." While Kenneth's brothers were at the pool hall, the appellant took Ham to a remote part of Lake Dallas, ostensibly to engage in target practicing with a pistol. The evidence indicated that both the appellant and J.D. Ham were intoxicated at the time. Ham finished firing the pistol and handed the gun to the appellant. The appellant took the pistol and made as if he were preparing to shoot toward a drink can he had thrown into the lake. Rather than shooting the target, the appellant abruptly swung around and shot Ham once in the head and once in the chest area. Linda Patterson, appellant's girlfriend, testified as to a conversation she had with the appellant later that evening: "He [appellant] asked me if I knew what brains looked like. And I said 'No.' It hadn't got quite dark yet. He told me to look up, that is what brains look like, like clouds.... He [appel-lant] said him and J.D. [Ham] were on the riverbank target practicing. J.D. had just got through with his turn, handed the gun to Kenneth, J.D. was doing something to the bullets and Kenneth pretended he was going to shoot whatever they were shooting at. He swung the gun around and shot J.D. twice in the chest. And J.D. fell down and he shot him once through the head."

The appellant and state presented contradictory versions as to whether the wallet was on Ham's person at the time of the murder or whether the appellant removed the wallet from the decedent's back pocket after the killing. The appellant then dumped Ham's body into the shallows of Lake Dallas. It was recovered some four days later, after being spotted floating face down in the lake by a fisherman and his son. The autopsy revealed that the decedent was shot twice: once in the left chest area and once in the skull. According to the evidence, either would would have caused the death of the victim.

Following the murder, the appellant, his sister, and his girlfriend fled to Austin, Minnesota, where they were later arrested and returned to Denton County after waiving extradition. Evidence obtained from the appellant's girlfriend's purse included Ham's wallet and several items of identification bearing the name of J.D. Ham.

In addition to the above testimony, in a videotaped statement, the appellant confessed to the murder of J.D. Ham by shooting him with a pistol. According to the appellant, the victim's wallet was left on the dashboard of the car while the two were target practicing. The jury obviously believed the state's version of the offense and the appellant's confession and concluded that he had murdered the deceased in the course of committing a robbery.

I.

In his first point of error, the appellant asserts that the trial court erred in denying his request for a continuance and an attachment for an absent witness that had been subpoenaed by the state. The record establishes that the state requested and

had served on Larry Gentry [1] a subpoena ordering him to appear in court on January 16, 1984, at 10:00 a.m. "and there to remain from day to day, and from term to term until discharged by said court...." He was served with the subpoena at 2:30 p.m. on December 13, 1983.

The defendant's trial began with the jury selection on February 1, 1984; however Gentry was not called as a witness by the state. Instead, the appellant called Gentry to testify on March 1, 1984. The witness was not present to testify. The appellant then made an oral motion for a continuance and an attachment for the witness. He further requested the trial be indefinitely continued "until such time as the subpoenaed witness can be found." The trial court denied both requests.

■ There is no doubt that when a subpoena is issued it "inure[s] to the benefit of the opposite party in such case in the event such opposite party desires to use such witness on the trial of the case...." Article 24.03, V.A.C.C.P. *Erwin v. State*, 729 S.W.2d 709 (Tex.Cr.App.1987). Obviously, the mere act of having a subpoena issued and executed does not inexorably result in the witness appearing as directed. An attachment is the proper remedy when, after being subpoenaed, a witness fails to appear as directed. *Id.*

During the course of a trial, a continuance may be granted "when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had." Article 29.13, V.A.C.C.P.

In the present case, we are therefore confronted with the relationship of Article 24.03, supra, with Article 29.13, supra— each authorizing the court to grant specific relief when a witness fails to appear as directed. The appellant's point of error

condemns the trial court for failing to issue an attachment *and* grant a continuance.

Preliminarily it should be noted that, contrary to the state's position, the record is clear that at the time the subpoena was applied for and served on the witness he was a Denton County resident.[2] According to the application for subpoena required by Article 24.03, supra, the witness' address was "109 Massey Street, #25, Denton." The "Officer's Return" in the subpoena reflects that the witness was served on the date and at the time previously noted "in Carroll Courts Bldg.[,] Denton."

The record also reveals that apparently after the subpoena was served the witness left Denton for Georgia. For the purpose of the subpoena, however, the residence of the witness on December 13, 1983, was Denton County.

■ According to Article 24.01, supra, a subpoena authorizes a designated person to summon one or more persons to appear at a specified term of the court, or on a specified day, to testify. Article 24.06, supra, in relevant part, provides that one "refuses to obey a subpoena: 1. If he is not in attendance in the court on the day set apart for taking up the criminal docket or on any day subsequent thereto and before the final disposition or continuance of the particular case in which he is a witness...." *Id.* In other words, and read in conjunction with Article 24.01, supra, one disobeys a subpoena if he fails to appear on the date noted in the subpoena or fails to be present any day subsequent thereto.

■ It would be illogical and unreasonable to require a subpoenaed witness to appear on a certain date, at a certain time and remain there *ad infinitum.* Accordingly, Article 24.06(1), supra, demands the presence of a subpoenaed witness only so long as the case is not finally disposed of or the case is continued. In the event the

---

1. Larry Gentry is the brother of appellant, Kenneth Gentry.

2. In a hearing outside the presence of the jury, one of the appellant's attorneys made the following comment to the court regarding the residence of the absent witness: "We have exercised whatever diligence we can to try and locate him and have gone by the residence at which he was served [this was incorrect], which is 109 Massey Street, Number 25, here in Denton. We are informed that he does not live there anymore...."

case is concluded or continued the witness is no longer subject to the subpoena.

■ In the present case, the witness was ordered to appear as a witness for the state on January 16, 1984. Although it is not clear from the record, this was apparently the date the case was originally set for trial. Further, the record does not specifically note whether the witness appeared on January 16, 1984.[3] Regardless, the case was continued until February 1, 1984. Therefore, under Article 24.06, supra, because the case was continued the witness was no longer subject to the subpoena issued by the state. Consequently, the witness was not in disobedience of a subpoena when he was not present to testify on March 1, 1984.

■ That, however, does not resolve entirely whether an attachment should have issued because Article 24.14, supra, authorizes the issuance of an attachment for a resident witness prior to the disobedience of a subpoena. But, in order to obtain such an attachment the party requesting the attachment must file "an affidavit with the clerk ... [stating] that he has good reason to believe, and does believe, that such witness is a material witness, and is about to move out of the county...." *Id.*

The appellant's attorney, in urging his request for an attachment to the trial court, conceded that in "December of 1983 ... [the witness] was on his way from Georgia." Thus, some time after the witness was served, he moved to Georgia. Despite this the appellant failed to file an appropriate affidavit and request an attachment in a timely manner. Article 24.14, supra.

Furthermore, with full knowledge that the witness had moved out of Denton County to Georgia, the appellant at no time attempted to secure the presence of the witness by utilizing the "Uniform Act to secure attendance of witnesses from without the State." Article 24.28, supra.

In *Erwin v. State*, supra, the Court was confronted with a similar situation. In that case, a witness had been subpoenaed by the state to appear on a specific date. The witness was called to testify over a month after she was ordered to be in court. However, the witness was not present when called; therefore, the defendant moved for an attachment which the trial court denied. This, according to the Court, constituted reversible error.

*Erwin*, however, is distinguishable from the present situation. In *Erwin*, supra, the prosecution apparently was not continued to a date after the witness was ordered to appear. Thus, the witness in *Erwin* was still subject to the subpoena, whereas Gentry was not subject to the subpoena.

Therefore, the trial court did not commit an error in refusing to issue an attachment for the witness.

■ We also find that the trial court did not err in refusing the appellant's request for a continuance. As previously noted, Article 29.13, supra, does authorize a continuance after a trial has commenced. However, to be entitled to such a continuance a defendant must comply with each of the statutory prerequisites. Initially, the request for a continuance must be in writing and sworn to by the defendant. Article 29.03, supra; Article 29.08, supra; *Rosales v. State*, 473 S.W.2d 474 (Tex.Cr.App.1971). In addition, the written motion must allege facts sufficient to constitute surprise and diligence. Article 29.13, supra. Further, since the motion is not self-proving, *Rollins v. State*, 488 S.W.2d 429 (Tex.Cr.App. 1972), the record must contain an affidavit or otherwise reflect what the absent witness would have testified to. *Brito v. State*, 459 S.W.2d 834 (Tex.Cr.App.1970). And, the expected testimony has to be material to the defendant. *Berry v. State*, 442 S.W.2d 713 (Tex.Cr.App.1969). In the present case, there was no written, sworn motion for continuance. Consequently, the first predicate necessary to constitute error was not complied with. Instead, the appel-

---

**3.** In denying the appellant's request for an attachment and a continuance the court made the following comment: "There is no indication there has been any effort to locate him since he failed to appear on the 16th day of January."

lant made an oral motion for continuance and asserted therein his claim of surprise, diligence, and the materiality of the absent witness' testimony. The appellant's claims in each instance is without merit. First, as we have previously concluded the witness was not subject to a subpoena; therefore, the appellant cannot legitimately claim he was surprised by the witness' failure to appear. *Jones v. State,* 501 S.W.2d 677 (Tex.Cr.App.1973).

Second, the appellant has failed to prove he acted diligently in attempting to obtain the witness' presence in court. In the old case of *Mills v. State,* 204 S.W. 642 (1918), this Court, interpreting Art. 518 C.C.P. (1895), a statutory predecessor to and essentially the duplicate of Article 24.06, supra, stated that there was an absence of diligence in securing the attendance of an absent witness "where a witness lives in the county where the case is pending [i.e., the witness in the present case], who has been subpoenaed, and removes therefrom before the next term of court at which the case is called for trial, it is the duty of the appellant to again have him served with process to the county where he has removed." *Id.,* at 644.

Although the holding in *Mills v. State,* supra, is limited to terms of court its reasoning is equally applicable to witnesses who fail to appear after a case is continued beyond the date one is instructed to appear. Therefore, "it is the duty of the appellant to again have him served with process...." *Id.* And, the failure to do so constitutes a lack of diligence. In the present case, the appellant has failed to prove he acted diligently in attempting to secure the witness' presence.

Third, as previously noted, it is the responsibility of the appellant to prove that the expected testimony of the absent witness would have been material. *Brito v.*

*State,* supra. Ideally, this is accomplished by a sworn affidavit of the absent witness identifying the expected testimony. However, as the Court noted in *Willis v. State,* 626 S.W.2d 500 (Tex.Cr.App.1979): "We realize that in most cases the unexpected absence of a subpoenaed witness precludes obtaining an affidavit in support of a continuance." *Id.,* at 502, fn. 2. Thus, as *Willis, id.,* recognized, "In such situations, a showing under oath of the expected testimony is sufficient."

In the present case, there was no affidavit of the absent witness accompanying the motion for continuance. Further, there was no sworn testimony accompanying the motion for continuance which suggest what the nature of the witness' testimony would have been.[4]

■ In *Parsons v. State,* 160 Tex.Cr.R. 387, 271 S.W.2d 643 (1954) (Appellant's Motion for Rehearing) cert. denied. 348 U.S. 837, 75 S.Ct. 36, 99 L.Ed. 660 (1954), the Court detailed the procedures necessary to preserve error when the court denies a motion for continuance based on the absence of a witness. The Court stated:

When one complains of the failure of the trial court to grant continuance, it becomes incumbent upon him to show, both in the trial court and here, that he has been injured by such ruling. Such a showing is made by establishing with some degree of reliability that the missing witness would have testified to something material and beneficial to the accused. No affidavits of the missing witnesses were attached to the motion for continuance in the case at bar. This is not a prerequisite to a valid motion, but having failed to so attach them at that stage of the trial, it became incumbent upon an accused, who wishes to rely upon the alleged error of the court, to file a motion for new trial and there

4. After it became apparent that the witness was not present to testify, the appellant's attorney claimed that the witness would have testified that the appellant did not kill the deceased. Responding to such claim, the state introduced a transcript of a taped interview and two other statements of the absent witness. Without going into the details of each statement, it is suffi-

cient to note that in each case the absent witness stated that the appellant had admitted to him and other family members that he had murdered the deceased. This is consistent with another state's witness' testimony. Furthermore, the appellant's videotaped confession supports the witness' claims of his admissions.

make his showing just as is required in cases involving jury misconduct. Without satisfactory proof to the contrary, the trial court might reasonably conclude that the witnesses would not have so testified. A mere recitation that the appellant expects to prove certain things by the witnesses is not sufficient.

See also: *Ong v. State,* 167 Tex.Cr.R. 452, 321 S.W.2d 91 (1959); *Lacy v. State,* 168 Tex.Cr.R. 220, 325 S.W.2d 392 (1959); *Marable v. State,* 385 S.W.2d 676 (Tex.Cr.App. 1965); *Fields v. State,* 495 S.W.2d 926 (Tex.Cr.App.1973); *Willis v. State,* supra.

In his amended motion for new trial the appellant did claim that the court should have granted a continuance in order to secure the presence of the missing witness. However, there was no affidavit accompanying the motion. Further, at the hearing on the motion for new trial there was no testimony as to what the witness' testimony would have been. Thus, the procedures identified in *Parsons v. State,* supra, were not complied with.

Based upon the above, the trial court did not err in denying the appellant's request for an attachment or his motion for continuance. Therefore, appellant's first point of error is denied.

## II.

The appellant's second point of error addresses the admissibility of the appellant's videotaped confession. The appellant gave two confessions. The first was an oral statement that did not comply with the standards of admissibility set forth in Article 38.22, V.A.C.C.P. This confession was not introduced into evidence in the presence of the jury. The appellant's second confession was videotaped and it was admitted into evidence. The appellant complains that his initial inadmissible oral confession was made under duress, thereby tainting the subsequent videotaped confession and rendering it inadmissible.

The appellant advances the argument that the unrecorded oral confession was not in compliance with Article 38.22(3)(a), V.A.C.C.P., which set forth the statutory prerequisites for the admissibility of oral statements made by an accused.[5] As previously noted, this confession was never introduced into evidence at trial. Thus, whether it complied with Article 38.22, supra, is irrelevant.

Relative to his claim that his initial oral confession was made under duress, thereby rendering his subsequent videotaped confession tainted and inadmissible, the following circumstances are germane: the appellant was being held in the Denton County Jail after his arrest for the murder of J.D. Ham, for which he was ultimately convicted.[6] On October 12, 1983, the appellant's mother was arrested for introducing a gun into the Denton County Jail during a visit with the appellant. The appellant's mother was housed in the prison cell directly behind that of her son. Over the course of the next week to ten days, the appellant maintained that his mother constantly cried and begged to be released. Around October 23, 1983, appellant, of his own volition, inquired of jail officials whether there was anything he could do which might prompt his mother's release. He was told to speak with a deputy sheriff, to whom appellant made his initial oral confession. Immediately after the appellant confessed to the

---

**5.** Article 38.22 When Statements May be Used.

\* \* \* \* \* \*

Sec. 3(a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
(1) an electronic recording, which may include a motion picture, videotape, or other visual recording, is made of the statement;
(2) prior to the statement but during the recording the accused is given the warning in subsection (a) of section (2) above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;
(3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate, has not been altered, and reflects that the accused was advised before the interrogation that the interrogation will be recorded; and
(4) all voices on the recording are identified.

**6.** The findings of fact submitted by Judge Will C. Boyd indicate that the appellant was returned to Texas from Austin, Minnesota, where the appellant was arrested, on September 17, 1983.

killing, the deputy asked him if he wanted to provide a videotaped statement. Appellant asked whether giving such a statement would help expedite his mother's release from jail. The deputy responded that he had no authority to make any "deals" with him, but would contact the district attorney's office to enable the appellant to discuss the matter with someone who had such authority.

The same day, the appellant discussed the matter with an assistant district attorney, who informed the appellant in the presence of other witnesses that no deals could be made on his mother's behalf. Even so, the appellant chose to provide a videotaped statement and was apprised of his rights prior to confessing to Ham's murder. After making the confession, the appellant was escorted back to the jail cell. Shortly thereafter, it was discovered that the audio portion of the videotape had failed—Gentry's recorded confession was lost. The deputy explained the problem to him and asked if he would be willing to make a second statement on videotape. Appellant readily consented and made another videotaped confession on October 24, 1983, with the audio and video intact. After excising appellant's comments regarding extraneous offenses, the videotape was viewed by the jury at the guilt phase of the trial. The jury viewed the unedited version during the punishment proceedings.

■ Before discussing the matter of duress, there is no indication that the provisions of Article 38.22, supra, were violated in making the videotaped confession. The appellant stated in the confession and testified at the suppression hearing that he understood his rights. Interestingly, the appellant was inadvertently provided with an opportunity to refuse to make a second confession after it was discovered that the audio portion of the first confession did not "take." Nevertheless, after the video equipment difficulties were rectified, the appellant readily volunteered to make a second statement, was given the same warnings and again confessed to the offense.

■ Appellant's contention that the second videotaped statement was made under duress lacks merit. It was the appellant who initiated contact with the authorities to make the confession. Moreover, it is apparent that the authorities did not guarantee any advantage to appellant or collateral benefit to his mother in exchange for the confession. At most, appellant was operating under the misapprehension that if he made the statement, the authorities might then consider doing something for his mother. For example, at the suppression hearing the appellant testified:

Q: [Prosecutor] You are saying that I told you that I wouldn't make any deal until I saw your statement?

A: No. You said you couldn't make any deals before I made any statement.

The appellant further testified at the suppression hearing that no promises were made:

Q: So, nothing was promised to you, you know, like if you plead guilty we will reduce it to sixty years or something like that?

A: No, sir.

Q: Or if you gave a confession we will put your momma on probation?

A: No, sir.

Indeed, it appears that the appellant had less altruistic reasons for making the challenged statement than securing his mother's release:

Q: [Prosecutor] Okay. And you wanted to know if you could make a deal, is that right?

A: Yes, sir.

Q: And I take it you felt some sense of responsibility, is that right, for her situation?

A: Wasn't a sense of responsibility for her situation. It was the fact of listening to her all the time that bothered me.

■ In his brief, appellant claims that moral compulsion was directly used against him by placing his mother in a nearby cell, prompting a confession he otherwise would not have given in exchange for leniency toward his mother. The burden of proving that a confession was rendered voluntarily is on the state. In *Eng-*

*lish v. State,* 592 S.W.2d 949 (Tex.Cr.App. 1980), cert. denied 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980), this Court held that the prosecution met this burden, notwithstanding the defendant's claim that he signed the confession to stop beatings and to get his sister and girlfriend out of jail. English acknowledged that he was not threatened or abused during questioning that led to the confession. "Under the totality of the circumstances," said this Court, "we conclude that the state met its burden of proving the voluntariness of the confession ..." *Id.,* at 952. Similarly, after a careful review of the record and examination of the circumstances surrounding the confession, it is obvious that the appellant was not operating under coercion or undue influence when he confessed. After hearing the pretrial testimony of appellant, the prosecutor, and the deputy sheriff, the trial court was at liberty to disbelieve appellant's assertions of personal compulsion in making his confession. Accordingly, at a hearing on the voluntariness of a confession, the trial court is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Vigneault v. State,* 600 S.W.2d 318, 328 (Tex.Cr.App.1980) (defendant claimed involuntary confession due to his intoxication); *Moon v. State,* 607 S.W.2d 569, 570 (Tex.Cr.App.1980) (defendant claimed involuntary confession due to personal threats).

▮ Even assuming the appellant's assertions as to duress were true, he states no claim which would warrant reversal. First, the record clearly reflects that the defendant initiated the contact with the authorities at the outset. Second, there is no indication that the authorities used tactics which could be considered coercive. Third, there is scarcely a suggestion of a nexus between the treatment of appellant's mother while in custody for smuggling a handgun into prison, and the appellant's willful confession to a capital murder

charge. The evidence in this case sustains the court's findings of fact and conclusions of law ensuing from the *Jackson v. Denno* hearing. Appellant's second point of error is overruled.

### III.

In a related point of error, appellant contends that the trial court erred in admitting into evidence the videotaped confession which was taken from appellant moments after he talked to the prosecuting attorney. Appellant contends that the prosecutor violated Article XII, § 8, DR 7-104 of the Code of Professional Responsibility:

(A) During the course of his representation of a client the lawyer shall not:

(1) Communicate or cause another to communicate on the subject of representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such party or is authorized by law to do so.

\* \* \* \* \* \*

Article XII, § 8, Rules Governing the State Bar.[7] The appellant emphasized that the prosecutor negotiated with him regarding his statement while purposefully failing to contact the appointed counsel representing him, thereby rendering the resulting statement inadmissible at trial.

▮ Prior to making the videotaped statement the appellant explicitly stated that he did not want his court appointed counsel present. Without a doubt the appellant waived his right to counsel prior to making the statement. *Jones v. State,* 742 S.W.2d 398 (Tex.Cr.App.1987). Therefore, the only question left to resolve on this point is whether a violation of a disciplinary rule constitutes a violation of state law sufficient to invoke the exclusionary rule. This issue was addressed by this Court in *Pannell v. State,* 666 S.W.2d 96, 98 (Tex. Cr.App.1984), where we held that the disciplinary rules of the Code of Professional

---

7. Article XII, § 8 of the Rules Governing the State Bar were repealed and Article X of the State Bar Rules was adopted by the Supreme Court on February 29, 1984, effective March 1, 1984. The same order restated the Texas Code

of Professional Responsibility (formerly appearing as Article XII, § 8 of the Rules Governing the State Bar) as Article X, § 9, of the State Bar Rules.

Responsibility are not laws of the State of Texas as contemplated by Article 38.23, V.A.C.C.P. Article 38.23, *id.,* provides, in pertinent part:

(a) No evidence obtained by an officer or other person in violation of any criminal provisions of the Constitution or laws of the State of Texas, or the United States of America, shall be admitted in evidence against the accused on trial in any criminal case.

 The *Pannell* Court concluded that while the State Bar Rules are "quasi-statutory" and "have the same force and legal effect upon matters to which they relate as the Texas Rules of Civil Procedure have to matters in which they relate," the Disciplinary Rules were prepared for an administrative agency—the State Bar of Texas—and thus do not have the same force and effect as laws because they are not legislatively enacted. *Id.,* at 98, quoting in part *Rattikin Title Company v. Grievance Committee of the State Bar of Texas,* 272 S.W.2d 948 (Tex.App.—Fort Worth 1954, no writ). "[V]iolation of one of these disciplinary rules in obtaining evidence for a criminal proceeding will not bar the introduction of that evidence at trial." *Id.,* at 98. See also *Henrich v. State,* 694 S.W.2d

341 (Tex.Cr.App.1985), cert. denied 482 U.S. 913, 107 S.Ct. 3183, 96 L.Ed.2d 672 (1987), in support of the same proposition. Ethical violations, said the Court, are to be dealt with by means of administrative mechanisms established for dealing with such unethical conduct. The proper forum to dispense with such violations is within the chambers of the administrative body which both promulgates and enforces the rules. Based on the precedent established in *Pannell* and *Henrich,* supra, it is apparent that the disciplinary rules do not fall within the purview of Article 38.23; nor do they have a pivotal impact upon the defendant's constitutional right to or waiver of counsel. Uncounseled post-indictment statements are not generally excluded per se in criminal practice because of reliance on the defendant's waiver;[8] consequently, such ethical violations are usually considered harmless.[9] However, where an uncounseled post-indictment statement is obtained in contravention of DR 7–104(A)(1), the facts and circumstances surrounding defendant's waiver and statement will be subject to meticulous and exacting scrutiny on appeal.

 Applying such an analysis to the present case, it is apparent that any error

**8.** Compare the civil law side, where an attorney negotiating with the opposing party without attempting to contact that party's counsel constituted an ethical violation. See, e.g., *Shelton v. Hess,* 599 F.Supp. 905 (D.C.1984), where conferences between the defendant and plaintiff's counsel in which matters pertaining to the cause of action were discussed without informing or receiving the consent of defense counsel represented a violation of DR 7–104 and warranted disqualification of plaintiff's counsel from further participating in the suit at bar, notwithstanding the fact that the defendant himself initiated the contact between himself and the plaintiff's counsel or that the plaintiff participated in and encouraged such contacts.

**9.** The Federal courts have rejected a per se exclusion of uncounseled post-indictment statements, relying instead on the defendant's waiver. Nonetheless, while noting that a violation of the ethics rules does not generally warrant reversal, the Tenth Circuit held that:

Once a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered into evidence for any purpose unless the accused's attorney was notified of the interview and was given a reasonable opportunity to be present. To hold otherwise, we think, would be to overlook conduct which violated both the letter and the spirit of the canons of ethics. This is obviously not something that the defendant alone can waive.

*United States v. Thomas,* 474 F.2d 110, 112 (10th Cir.1973).

The Fifth Circuit addressed the same issue in *Wilson v. United States,* 398 F.2d 331 (5th Cir. 1968), when appellants made oral admissions to agents of the Federal Bureau of Investigation out of the presence of appellants' counsel when the agents were aware that counsel had been appointed:

'That fact alone,' said the court, 'will not in our opinion render inadmissible the admissions made, as held in the case of *Coughlan v. United States,* 391 F.2d 371 (9th Cir.1968). However, this court agrees with the dissenting opinion [in *Coughlan* ] as to the impropriety of government interrogation of a person in custody pending trial, in the absence of counsel which the interrogator knew had been appointed to represent the defendant.'

*Wilson,* supra, at 333.

resulting from the prosecutor's failure to contact appellant's counsel as required by DR 7–104(A)(1), which served the basis of appellant's objections to the admissibility of the statement both at trial and on appeal, is not harmful error to an extent mandating reversal. It should be noted that the appellant did not claim that his constitutional right to counsel under the Sixth Amendment was violated by the prosecutor's conduct. Therefore, it is unnecessary and would be inappropriate to consider the impact of either *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) or more recently *Patterson v. Illinois*, —— U.S. ——, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). Accordingly, appellant's third point of error is overruled.

### IV.

In his fourth point of error, appellant contends that at the punishment stage of the trial, the state, over appellant's objection, erroneously offered into evidence a penitentiary packet from the State of Georgia. Appellant contends that the petition for revocation of probation and the order of revocation contained in the pen packet were inadmissible because they contained allegations of extraneous offenses. The petition for revocation of probation included in appellant's penitentiary packet states that "Subject committed the offense of vehicle theft on 1/1/80; Burglary on 1/1/80; and Attempted Theft on 1/1/80, in Bartow County, Georgia...." The order revoking probation states that the appellant committed "the offenses of burglary, arson, motor vehicle theft, and two counts of burglary." Specifically, appellant urges that since the allegations of extraneous offense in the referenced documents never resulted in conviction, they are inadmissible under Article 37.07, § 3(a), V.A.C.C.P. Article 37.07 provides: ·

> Art. 37.07. Verdict must be general; separate hearing on proper punishment....
>
> Sec. 3. Evidence of prior criminal record in all criminal cases after a finding of guilty.
>
> (a) Regardless of the plea and whether the punishment be assessed by judge or jury, evidence may, as permitted by the Rules of Evidence, be offered by the state and the defendant as to the prior criminal record of the defendant, his general reputation and his character. The term *prior criminal record means a final conviction* in a court of record, or any final conviction material to the offense charge ... [Emphasis added]

Appellant relies on *Mullins v. State*, 492 S.W.2d 277 (Tex.Cr.App.1973), to support his argument that evidence of extraneous offenses not resulting in conviction admitted during the penalty phase of trial result in reversible error under Article 37.07, § 3(a), supra. However, Article 37.07, supra, has no application to the instant case. While it is true that evidence of extraneous offenses not resulting in conviction, but offered for enhancement purposes is normally inadmissible under 37.07, § 3(a), supra, the rule pertaining to admission of extraneous offenses during the punishment phase in capital murder cases is altogether different. Capital cases fall within the purview of Article 37.071(a), V.A.C.C.P.:

> Article 37.071 Procedure in capital case.
>
> (a) Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court before the jury as soon as practicable. In the proceeding, *evidence may be presented as to any matter that the court deems relevant to the sentence.* This subsection shall not be construed as to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas. The state and the defendant or his counsel shall be permitted to present argument for or against the sentence of death. [Emphasis added]

\* \* \* \* \* \*

The disparity between the statute pertaining to a non-capital case, where evidence of unadjudicated prior offenses is barred, and a capital case, where prior offenses are

---

admissible whether adjudicated or not, may at first seem incongruous. This Court had occasion to examine the legislative history behind Article 37.071(a), supra, the capital sentencing provision, as compared to Article 37.07, § 3(a), supra, upon which appellant in this case erroneously relies:

> The very choice of the Legislature to establish a bifurcated procedure in capital cases, like the one in non-capital cases, evinces its intention to eliminate the rule of evidence that excludes proof of extraneous offenses. Had it wanted to limit proof in capital trials to adjudicated offenses, it could have provided so in Article 37.071, as it has in Article 37.07. There being nothing in Article 37.071 to require such a limitation, this Court cannot impose it. ... [B]y deliberately choosing not to abolish the other exclusionary rules of evidence, the Legislature has kept them in effect at the punishment phase of a capital trial.

*Rumbaugh v. State*, 589 S.W.2d 414, 418 (Tex.Cr.App.1979).

Under Article 37.071(a), supra, and in light of the appellant's objection, the contents of the pen packet obtained from Georgia, including the petition and order revoking probation, were admissible during the punishment phase of the trial. Moreover, even under 37.07, an order revoking probation is considered a "prior criminal record" within the meaning of the statute: the order revoking a probated conviction is undoubtedly part of a defendant's "prior criminal record just as much as an information or indictment and a judgment are when coupled with a sentence, the trial court's final judgment." *Elder v. State*, 677 S.W.2d 538, 539 (Tex.Cr.App.1984) (overruling *Baehr v. State*, 615 S.W.2d 713 (Tex.Cr.App.1981) to the extent that it conflicts with *Elder*).

Absent a showing of surprise, proof of an unadjudicated, extraneous offense at the sentencing stage of a trial on a capital offense is admissible and does not deny a defendant due process and equal protection under the law. *Williams v. State*, 622 S.W.2d 116, 120 (Tex.Cr.App. 1981) cert. denied 455 U.S. 1008, 102 S.Ct.

1646, 71 L.Ed.2d 876 (1982). See also *Morin v. State*, 682 S.W.2d 265, 269 (Tex.Cr. App.1983) (court did not err in admitting, in penalty phase of capital murder prosecution, details of defendant's prior out-of-state conviction and details of an unadjudicated robbery offense occurring out of state); *Smith v. State*, 683 S.W.2d 393, 406 (Tex.Cr.App.1984) (appellant failed to show that prior out-of-state convictions were void for lack of waiver and indictment in each case; pen packet admitted).

In the case before us, as in *Williams*, supra, the appellant made no claim of unfair surprise in admission of the penitentiary packet during the punishment phase. Appellant's fourth point of error is therefore overruled.

### V.

In his fifth point of error, appellant contends that the trial court erred by refusing to grant appellant's motion to quash the indictment. As grounds, appellant alleges a violation of Article 19.-01(a)(4), V.A.C.C.P., which provides, in pertinent part:

> (a) The district judge, at or during the term of the court, shall appoint not less than three nor more than five persons to perform the duties of jury commissioners ... and they shall possess the following qualifications:
>
> . . . . .
>
> (4) Be residents of different portions of the county
>
> . . . . .

Appellant bases this point of error on the basis that the grand jury commissioners selected to provide the 211th Judicial District Court of Denton County, with a list of potential grand jurors, were not from different portions of the county.

The statement of facts reflects that four out of the total five grand jury commissioners were from the City of Denton. Appellant contends that these commissioners were not "residents of different portions of the county" as contemplated by Article 19.-01(a)(4). In a similar issue, this Court held that the language mandating that grand

jury commissioners be selected from different portions of the county is directory and not mandatory. *Garcia v. State*, 522 S.W. 2d 203, 210 (Tex.Cr.App.1975), citing *Jones v. State*, 153 Tex.Cr.R. 276, 219 S.W.2d 463 (1949). In *Garcia*, the district clerk for the county testified that four of the five grand jury commissioners lived in the City of Hereford. Of the 18,900 people in the county, however, 13,900 lived in the City of Hereford. Of the four from the City of Hereford, one lived in the northeast, two in the northwest, and one in the center of the City of Hereford. "We feel," said the Court, "that there was a sufficient compliance in the statute and the trial court properly overruled appellant's motion [to quash]." *Id.*, at 210.

In the case before us, while it is undisputed that four of the five grand jury commissioners were from the City of Denton, the record does not reflect the proportion of residents of that county as compared to the population of the City of Denton. Thus, it appears that there was sufficient compliance with the statute. Accordingly, appellant's sixth point of error is overruled.

VI.

In his sixth point of error, appellant contends that his indictment should have been quashed because the manner in which the grand jury was impaneled did not adhere to the letter of the statutes. Specifically, appellant contends that the names of the prospective grand jurors for the July, 1983 term of the 211th Judicial District Court in Denton were returned in violation of Articles 19.09, 19.10, 19.11 and 19.13, V.A.C.C.P.

 The appellant reasons that the "shall" language of the aforementioned statutes mandates strict adherence. Regardless of the "shall" wording, the statutes relating to the organization of grand juries are directory and not mandatory. *Ex parte Traxler*, 148 Tex.Cr.R. 550, 189 S.W.2d 749 (1945). Courts are required to follow the "means and methods provided by the legislature in selecting grand juries," and "an arbitrary disregard of those statutes in the selection and organization of the grand jury vitiates and renders such grand jury without authority." *Ex parte Beckler*, 459 S.W.2d 442, 444 (Tex.Cr.App. 1970) and cases cited therein. However, absent an allegation of fraud or injury resulting from the selection of the prospective grand jurors, minor deviations from the statutory procedure do not rise to a level requiring reversal. See, e.g., *Hicks v. State*, 630 S.W.2d 829 (Tex.App.—Houston, [1st Dist.] 1982 writ ref'd).

 We will address each of the alleged statutory violations individually. Appellant first argues that the provisions of Article 19.09, V.A.C.C.P., were not complied with. Article 19.09 states, in pertinent part:

... the commissioners shall write their names across the seal of said envelope, direct the same to the district judge and deliver it to him in open court.

The only evidence regarding the manner in which the envelope from the grand jury commissioners was actually received came from Judge Ira Sam Houston, who testified at the pretrial hearing on the motion to quash the indictment. The appellant complains that the judge did not state that the envelope was delivered to him in open court. As far as we can see, this question was never posed to Judge Houston. Appellant cannot now protest on appeal concerning issues that he neglected to raise at the pretrial hearing on the motion to quash.

 Next, appellant complains of a violation of Article 19.10:

"... the Judge shall deliver the envelope containing the list of grand jurors to the clerk or one of his deputies in open court without opening the same."

Judge Houston testified in that he could not remember whether the list of grand jurors was delivered to the clerk or to one of his deputies. Relative to where the delivery occurred the following testimony was elicited:

Q: Judge Houston, where did you deliver the sealed envelope to the clerk?

A: The normal procedure is to bring the deputies and the District Clerk into the courtroom and deliver it to them and

give them the oath at that time. I can't remember whether I did that in the courtroom or whether I did that in the District Clerk's office.

However, the appellant has failed to prove that the envelope was not delivered in open court.

■ Appellant's third complained of violation concerns Article 19.11, V.A.C.C.P.:

Before the list of grand jurors is delivered to the clerk, the judge shall administer to the clerk and each of his deputies in open court the following oath ...

Quoting from the appellant's brief, "It is appellant's contention that (1) the oath required by Article 19.11, supra, was not administered prior to delivering the envelope containing the list of the prospective grand jurors to a clerk or the district clerk, but only that an oath was administered to all the *deputy district clerks* upon receiving an envelope from the *grand jury* (emphasis is appellant's); (2) that if any oath was given to the district clerk or any deputies that it was not done in open court; and (3) that the district clerk of Denton County was never administered an oath."

The appellant's complaints are all without merit because Judge Houston testified that he "administered the required oath to all of the *deputy district clerks* immediately upon receiving the envelope from the *grand jury* [sic]." From the context of the Judge's testimony, it is apparent he was referring to the *grand jury commission*. The grand jury for the July, 1983 term was not yet impaneled when the envelope was handed to the judge. If there was any harm caused by the failure of the judge to recollect whether he gave the oath to the clerk and deputies in open court or in the clerk's office, such harm could hardly be considered egregious. This is especially true in light of the judge's testimony that the *normal* procedure is to deliver the oath in open court. A one time deviation from this practice does not amount to a pattern of statutory violations, nor does it reflect an "arbitrary disregard of those statutes" under *Beckler*, supra. We find that the required oath was given to the "clerk and each of his deputies" pursuant to Article 19.11, supra.

■ Finally, the appellant complains that the court failed to follow the provisions of Article 19.13, V.A.C.C.P.:

the clerk shall open the envelope containing the list of grand jurors, make a copy of the names of those selected as grand jurors, certify to it under his official seal, note thereon the day for which they are summoned, and deliver it to the sheriff.

Appellant grounds his complaint on the absence of an "official seal" and a notation for the day for which the grand jurors were to be summoned. However, Judge Houston testified that the envelope was "sealed" and "signed by the members of the grand jury commission" when it was delivered to him. Moreover, despite the absence of a date, the grand jurors somehow managed to respond to their summons and appear as directed for the July, 1983 term.

It is imperative to recognize that the appellant admittedly does not allege fraud in the selection of the grand jury; nor does he show how the manner of selecting this particular grand jury was injurious to his rights. Consequently, we find beyond a reasonable doubt that the error, if any, made no contribution to the conviction of the appellant or his punishment under Rule 81(b)(2) Tex.R.App.Pro. Thus, any deviations from the above statutes, if error at all, are harmless. Appellant's sixth point of error is overruled.

## VII.

■ In his final point of error, the appellant asserts that the evidence was insufficient to support a jury verdict of capital murder. Specifically he alleges that the state failed to prove that appellant intentionally killed J.D. Ham "in the course of committing or attempting to commit ... robbery" in accordance with V.T.C.A. Penal Code, § 19.03(a)(2), under which he was charged in the indictment.

In relevant part, the indictment is as follows:

**796**

... that KENNETH GENTRY, who is hereinafter styled defendant, on or about the 10th day of September, A.D. 1983, and anterior to the presentment of this Indictment, in the county and state aforesaid, did then and there intentionally cause the death of an individual, Jimmy Ham, by shooting him with firearm, to-wit: a gun, while, the said KENNETH GENTRY was in the course of committing, and attempting to commit, the offense of robbery of Jimmy Ham ...

The appellant insists that he did not kill Ham for the purpose of obtaining identification to shield him from the authorities who wanted him in connection with his prison escape. Instead, the appellant offered an alternative hypothesis: in his videotaped statement he claimed that he, Ham, Violet Ann, and Linda were followed in their travels throughout the country by two unidentified men (both "well-dressed, medium build") who bid him to kill J.D. Ham or be killed himself. Wherever these two shadowy strangers appeared—at an Oklahoma motel parking lot, a Florida bar, and at the entrance to Pilot Knoll Park in Texas where the shooting occurred—they refused to provide the appellant with a justification for wanting Ham dead or explain their dogged insistence that appellant be the one to do the deed. The appellant was conveniently alone on each occasion in which he spoke to these mysterious characters.

Further, the appellant never mentioned his anxieties concerning the strangers to his girlfriend or sister, and of course not to J.D. Ham, his travelling companions. After viewing the videotape and hearing appellant's version of the facts, the jury was at liberty to reject this "hypothesis" and find that the appellant committed the murder with a logical motive: to obtain the identification of Ham, whom Gentry closely resembled.

The testimony presented at the trial revealed that the appellant admitted to at least four individuals, three of whom were family members, that he intended to kill Ham to gain a new identity. He developed the intent to deprive the victim of his iden-tification at least several days, perhaps weeks prior to the shooting. He even asked his uncle for "how to" advice. Such testimonial evidence, while circumstantial, provides a reasonable alternative hypothesis to appellant's justification that he killed Ham because he was told by two almost ghostly apparitions to do so. Moreover, the deceased's wallet and personal identification were found in the purse of appellant's girlfriend when appellant, his sister, and girlfriend were arrested in Austin, Minnesota a few days after the murder. Simply because the appellant presented a different version of events in his video-taped confession, the evidence upon which the appellant was convicted is not rendered insufficient. *Anderson v. State,* 701 S.W. 2d 868, 872 (Tex.Cr.App.1985) cert. denied 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 163 (1986).

The now-familiar standard in judging the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 317–318, 99 S.Ct. 2781, 2788–2789, 61 L.Ed. 2d 560 (1979). Conversely, the mirror reflection of the *Jackson* rule is that a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the defendant. *Johnson v. State,* 673 S.W.2d 190, 195 (Tex.Cr.App.1984); *Jackson v. State,* 672 S.W.2d 801, 803 (Tex.Cr.App.1984). It is not required that the circumstances should, to a moral certainty, exclude every hypothesis, but that the hypothesis is reasonable, consistent with the facts proved and the circumstances surrounding the offense. *Carlsen v. State,* 654 S.W.2d 444, 447 (Tex.Cr.App.1983).

It is apparent that the evidence and circumstances presented at trial were sufficient for the jury to find that the appellant murdered Jimmy Don Ham. The remaining question is whether the murder was committed "in the course of" robbing the decedent. Gentry asserted that Ham

left his billfold on the dashboard of the vehicle prior to the "target practice" session at Pilot Knoll Park where the offense occurred. However, the fact that the victim was murdered prior to being deprived of his wallet does not vitiate the intent to steal. V.T.C.A. Penal Code, § 19.03(a)(2), supra, has been construed to mean "conduct occurring in an attempt to commit, during the commission, or in immediate flight after the commission of the offense." *Drew v. State*, 743 S.W.2d 207, 216 (Tex.Cr. App.1987). A robbery of a victim immediately after shooting the victim resulting in his death is capital murder occurring during the course of committing a robbery. *Fierro v. State*, 706 S.W.2d 310, 313 (Tex. Cr.App.1986).

Based on the foregoing, the appellant's final point of error is overruled.

The appellant's conviction is affirmed.

ONION, P.J., and CLINTON, TEAGUE, MILLER and CAMPBELL, JJ., concur in result.