**Affirmed and Memorandum Opinion filed January 6, 2022.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-00205-CR

---

**SANTHY INTHALANGSY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court
Harris County, Texas
Trial Court Cause No. 1471491**

---

## MEMORANDUM OPINION

In this appeal from a conviction for capital murder, which returns to us after a remand from the Court of Criminal Appeals, we address two issues that were unaddressed in our previous opinion: (1) whether the trial court abused its discretion in the admission of alleged hearsay evidence, and (2) whether the trial court abused its discretion by denying a motion for continuance. *See Inthalangsy v. State*, 610 S.W.3d 138 (Tex. App.—Houston [14th Dist.] 2020) (overruling a challenge to the sufficiency of the evidence but sustaining a separate challenge to the admission of

certain evidence), *rev'd*, 634 S.W.3d 749, 760 (Tex. Crim. App. 2021) ("We reverse the judgment of the court of appeals and remand the case to that court to address Appellant's remaining points of error regarding Cassie's alleged hearsay statements and the motion for continuance."). For the reasons given below, we overrule each issue and affirm the trial court's judgment.

## BACKGROUND

A woman nicknamed Cassie was kidnapped twice in a single week. During the first kidnapping, Cassie retained the use of her cellphone, and she texted her landlord saying that she was "being held hostage" because of a "huge deal gone bad." Cassie indicated that she had been trying to facilitate a large transaction between drug dealers, but that someone had stolen the money, which belonged to her captors. Cassie did not identify her captors by name in her text messages, but she identified the street address where they were keeping her. The residence at that street address was occupied by appellant's girlfriend, Linda.

The captors released Cassie after she arranged to give them her father's boat to compensate them for their loss. Upon her release, Cassie went to her garage apartment, where her landlord immediately evicted her and her boyfriend, Jimmy.

Cassie then followed Jimmy to a house belonging to his friend, Frank, where Jimmy had been working as a mechanic. While on Frank's property, Cassie and Jimmy slept overnight in their separate cars, until Frank discovered them one morning and invited them inside to sleep on the couch.

As Cassie and Jimmy stayed with Frank, Cassie's captors renewed their search for her, apparently because of title problems with the boat. The captors first went to Cassie's garage apartment, where her landlord saw what he believed to be three Asian men going through the belongings that Cassie had left behind. Then they

2

went to the house belonging to Jimmy's parents, where they were identified as two Asian men (appellant and his associate Amalinh) and one Asian woman (Linda).

The captors were eventually tipped off by a man nicknamed Monk, another drug dealer in the area who knew the individuals involved and who knew about Linda's desire to track down Cassie. Monk called Frank one morning and asked if Frank knew the whereabouts of Cassie. When Frank said that Cassie was staying with him, Monk told Frank to not mention their conversation to anyone. Monk then told Linda where she could find Cassie.

Linda gathered appellant and Amalinh, and together they drove out to Frank's neighborhood, but they could not locate Frank's house. Linda contacted Monk, who lived nearby, and he agreed to show them the way.

Monk drove in his own car, and as he approached Frank's house, he called Frank and told Frank to meet him in his car, where he said that he would provide Frank with some drugs. As instructed, Frank walked outside to Monk's car, which was parked on the street, and he got inside. Linda then pulled into Frank's driveway, as Frank watched from a distance.

Frank saw appellant and Amalinh exit Linda's vehicle, rummage briefly through her trunk, and then walk towards his house. Shortly after they were inside, Frank heard a loud sound that resembled a gunshot. Then he saw Cassie being escorted out of the house with appellant and Amalinh on either side of her. Cassie and her captors got into the backseat of Linda's vehicle, with Cassie in the middle, and then Linda drove away.

Frank exited Monk's vehicle after Linda left. When Frank returned to his house, he found Jimmy gasping for air and bleeding from a single gunshot wound to the face. Frank called 911, and Jimmy was rushed to a local hospital, but Jimmy

3

succumbed to his injuries. The next day, Cassie's body was found near an area river, riddled with bullets.

Appellant was soon charged with Jimmy's capital murder, with the aggravating element being that the murder occurred during the course of Cassie's second kidnapping. Appellant pleaded not guilty, but a jury found otherwise, and because the prosecution did not seek the death penalty, the trial court sentenced him to a mandatory term of life imprisonment without the possibility of parole.

## HEARSAY

When the landlord was testifying, the prosecution offered into evidence the landlord's text messages with Cassie, in which Cassie reported that she was being held hostage because of a botched drug deal. Appellant objected to the text messages on the basis of hearsay, but the trial court overruled the objection. Appellant now complains that the trial court abused its discretion by admitting the text messages over his hearsay objection.

For purposes of argument only, we can assume without deciding that the text messages were hearsay and that the trial court abused its discretion by admitting them. The question then becomes whether appellant suffered harm under the standard for nonconstitutional error. *See Chapman v. State*, 150 S.W.3d 809, 814 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).

Nonconstitutional error must be disregarded unless it affects a defendant's substantial rights. *See* Tex. R. App. P. 44.2(b). An error affects a defendant's substantial rights when the error has a substantial and injurious effect or influence on the jury's verdict. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). If the error had no influence or only a slight effect on the verdict, the error is harmless. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

4

The erroneous admission of evidence is generally considered harmless "if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove." *See Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991). That rule applies here. Before the text messages were even offered into evidence, the landlord testified without objection that Cassie "told [him] that she was being held against her will." Also, Monk testified without objection that, before Jimmy's murder, he went to Linda's house and saw that Linda, appellant, and others were keeping Cassie and not letting her leave because of the money stolen in the botched drug deal. Cassie's father also testified without objection that his high-value boat went missing around the same time as Cassie's kidnapping, and that Cassie did not have permission to use the boat for any purpose. This testimony established the same facts as the text messages, which means that the text messages could not have had more than just a slight influence on the verdict.

We conclude that any error in the admission of the text messages was harmless.

## MOTION FOR CONTINUANCE

During the course of appellant's trial, a deputy in the Harris County Sheriff's Office received new information about the case from Monk's sister, who was not a testifying witness. The sister told the deputy that she learned from another source that Amalinh may have buried the weapon used in Jimmy's murder at an unspecified location more than two years earlier. The deputy passed along an overview of this conversation to the prosecution. Because the information concerned matters that were neither first-hand, specific, nor recent, the prosecution doubted that it could ever be used to obtain a search warrant. Nevertheless, the prosecution promptly disclosed the information to the defense, and a record of that disclosure was made outside the presence of the jury.

On the next day of trial, the deputy testified outside the presence of the jury that Monk's sister had identified her source by name, and the sister believed that the gun may have been buried in one of two cities in Brazoria County. The deputy testified that he could not find an exact match for the source, but the deputy was able to find an individual with a similar name, though that individual did not live anywhere near the two identified cities. The deputy opined that locating the source would be difficult, especially considering that Monk's sister had indicated that the source "would be unwilling to discuss this information with law enforcement."

The trial court encouraged the parties to use the upcoming weekend to investigate the new information. At a hearing the following week, the prosecution informed the trial court that the source's name and location had been determined. The prosecution also informed the trial court that the source's neighbor had discovered a gun in a clean-up effort after Hurricane Harvey. The neighbor turned the gun over to law enforcement, which determined that the gun had been stolen many years earlier. The prosecution represented that all of this information was disclosed to the defense.

The defense informed the trial court that a private investigator had pursued the new information over the weekend, but the investigator was unable to conduct an interview with the source, possibly because the source's friends and family had made the source aware that someone was looking for him. The defense orally moved for a continuance in order to track down the source and potentially establish evidence that Amalinh was the actual shooter in Jimmy's murder.

The trial court denied the motion for continuance. Appellant now complains of that ruling, which we review for an abuse of discretion. *See Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007).

6

The trial court may grant a motion for continuance "after the trial has begun, when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had." *See* Tex. Code Crim. Proc. art. 29.13. The motion must be written and sworn. *See* Tex. Code Crim. Proc. arts. 29.03, 29.08; *Anderson v. State*, 301 S.W.3d 276, 279 (Tex. Crim. App. 2009), *declined to follow on other grounds by Grado v. State*, 445 S.W.3d 736 (Tex. Crim. App. 2014). Our record does not reveal that appellant ever filed a written and sworn motion for continuance. Because his oral motion did not comply with the applicable rules, we cannot say that the trial court abused its discretion by denying it. *See Gentry v. State*, 770 S.W.2d 780, 786 (Tex. Crim. App. 1988) (finding no abuse of discretion where the defendant's mid-trial motion for continuance was oral, rather than written and sworn).

Even if appellant had filed a compliant motion, the trial court may have formed a reasonable belief that no benefit would have come from the continuance. Both sides indicated to the trial court that the source had no interest in coming forward or cooperating with investigators. The defense even recognized that it would not have "much luck getting [the source] into the courtroom." Based on these representations, and on the absence of any evidence to the contrary, the trial court could have reasonably concluded that a continuance would have been futile. *See Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006) (holding that a defendant cannot establish that the trial court abused its discretion by denying a motion for continuance unless the defendant shows "specific prejudice to his defense").

7

## CONCLUSION

The trial court's judgment is affirmed.

/s/    Tracy Christopher
Chief Justice

Panel consists of Chief Justice Christopher and Justices Bourliot and Hassan.

Do Not Publish — Tex. R. App. P. 47.2(b).