Death Opinion













IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-76,036






Hector Rolando Medina, Appellant



v.



The State of Texas







Direct Appeal from Case F07-32923-S of the 

282nd Judicial District Court of 

Dallas County





 Womack, J., delivered the opinion of the Court, in which Keller, P.J., and
Meyers, Price, Keasler, Hervey and Cochran, JJ., joined. Johnson, J., filed a
dissenting opinion.



 After hearing uncontested evidence that Hector Medina killed his two children and then
shot himself in the neck, a jury convicted him of capital murder in September 2008. The trial
court sentenced the appellant to death pursuant to the jury's answers to future-dangerousness and 
mitigation special issues. (1) The appellant now raises fifty-three points of error on direct appeal to
this Court. (2) Finding no reversible error, we shall affirm the judgment and sentence of the trial
court.

I. Batson Complaints


 In his first eight points of error, the appellant argues that the prosecution struck seven
venire members because of their race, in violation of the equal protection guarantees in the 14th
Amendment to the Federal Constitution. (3)

A. Standard of Review

 The three steps of a Batson hearing are well-known. First, the opponent of a peremptory
strike must make out a prima facie case of racial discrimination. Second, the burden of
production shifts to the proponent of the strike to come forward with a race-neutral explanation.
Third, the trial court determines whether the opponent of the strike has proved purposeful racial
discrimination. The burden of persuasion rests with, and never shifts from, the opponent of the
strike. (4) 

 The determination of whether the proponent's explanation is a pretext "is solely a
question of fact; there is no issue of law." (5) Because the trial court's fact finding will be based on
factors not evident in the record, such as the lawyers' courtroom demeanor and credibility, a
reviewing court will give great deference to the fact finding and reverse only if the finding was
clearly erroneous. (6) 

B. Appellant's Claims

 The appellant objected to the prosecution's use of its peremptory challenges on seven
venire members. The trial court held a single Batson hearing for all seven claims. For six venire
members, the trial court found a prima facie case of discrimination, but then found the State's
race-neutral reasons believable. For the one remaining venire member, who the State and trial
court did not believe was a member of a racial or ethnic minority, the trial court overruled the
defense objection without requiring the prosecutor to give a race-neutral reason. 

 For the strikes of venire members Jordon, Munoz, Syed, Youngblood, and Santos, the
appellant presents no rebuttal to the prosecution's race-neutral reasons. Jordan was 24 years old,
and the state did not believe she had sufficient life experience to be a good juror on a death
penalty case. (7) Venire member Munoz stated on his questionnaire that he would never return a
verdict that assessed the death penalty. (8)

 Venire member Syed expressed hostility to the death penalty in his questionnaire and
during voir dire, and had attended anti-death-penalty concerts. Venire member Youngblood was
uncertain whether killing a child under age six should be a capital offense. Venire member
Santos gave questionnaire answers expressing negative views of the death penalty and said that
her religious beliefs taught her that the death penalty was wrong. 

 We have identified a number of factors that may be relevant in determining whether
purposeful racial discrimination has been proved. (9) The appellant has not shown us any factors to
consider other than the races of the struck venire members. The appellant's observation that these
five venire members were qualified to be jurors is irrelevant for the purpose of proving racial
discrimination. We do not believe that the trial judge's decision on these five venire members
was clearly erroneous.

 A sixth venire member, Johnson, gave questionnaire answers similar to the answers of
white venire members whom the State did not strike. Johnson rated his support for the death
penalty as 5 out of 10 on the juror questionnaire. The State explained that it struck all panelists
who gave an answer of less than 6, except for two white venire members, Jones and Riley, who
answered 5. The State's race-neutral reason for differentiating among the three was that Jones
and Riley seemed particularly offended by the murder of children under the age of six. In such a
situation, we may look at how the State conducted its voir dire examination of the relevant
panelists to see if the prosecution's stated reasons reflect the actual voir dire questioning. (10)

 The State asked each of these three how he felt about the murder of a child under the age
of six relative to the other types of capital murders. Johnson stated that on a 1 to 10 scale, he was
a 5 in terms of general support for the death penalty, and that he would "still sit in the middle" on
the particular matter of "a child killer." In contrast, Jones, who had listed himself as "a 5 or a 6"
on the death penalty, declared that murdering a child was the worst type of capital murder: "I
would probably have a bias around 9 or so, because I just couldn't believe it." Riley also ranked
murder of a child under the age of six as the worst of the capital offenses. He went so far as to
declare that he would consider the murder of a child to be worse than if he himself were
murdered, because he "would be in a better position than a child" to defend himself. After
examining the record, we cannot find that the trial judge's ruling on this challenge was clearly
erroneous.

 The seventh venire member was Greenhauf, (11) an American with dual Brazilian
citizenship who was born to American missionaries in Brazil and described himself as white on
the juror questionnaire. In two points of error, the appellant complains about the strike itself, and
that "the trial court erred in denying appellant a hearing on his 'Batson' challenge." 

 The appellant says that there was not a Batson hearing regarding the Greenhauf strike.
But during the hearing for all of the appellant's Batson complaints, the appellant argued that
Greenhauf was struck for racial reasons. The appellant explained that Greenhauf was "a Latino"
who had spent "half his life" in Brazil. When the prosecutor pointed out that Greenhauf was "a
white male," the trial court responded, "Well, I think that's sufficient," and did not require the
State to present a race-neutral reason for the strike.

 "[A] defendant satisfies the requirements of Batson's first step by producing evidence
sufficient to permit the trial judge to draw an inference that discrimination has occurred." (12) In this
case, even if the trial court did not explain it in such terms, the appellant did not make a prima
facie case of racial discrimination and therefore the hearing did not proceed to the second and
third steps. (13)

 Later in the hearing, and unprompted by the trial court, the State gave its reasons for
striking Greenhauf. (14) Once the State offers a race-neutral explanation for a challenged strike,
whether the appellant made a prima facie showing of racial discrimination becomes moot, and a
reviewing court should look at the State's reasons. (15) Here, the State claimed that Greenhauf
"thinks spending a lifetime in prison is equivalent to the death penalty" and was "very
comfortable with giving life just as much as death, if not more." The appellant offers us no
reason to believe that the State's reasons were mere pretexts. We overrule points of error one
through eight.

II. Challenges for Cause

 After five weeks of examining venire members, the trial court qualified 47 from whom to
select a jury. The appellant used his 15 peremptory strikes and was granted another two by the
court. In eighteen points of error, he now argues that each of the venire members he struck, as
well as one juror who sat on the case, should have been excused for cause. (16)

A. Standard of Review

 A venire member may be challenged for cause for having a bias for or against the
defendant, or against the law. (17) The trial court should grant a challenge for cause if these biases
would be so strong as to substantially impair the panelist's ability to carry out his oath and follow
the court's legal instructions. (18) The proponent of a strike does not meet his burden "until he has
shown that the venireman understood the requirement of the law and could not overcome his
prejudice well enough to follow it." (19) 

 When reviewing the grant or denial of a challenge for cause, we examine the record of the
voir dire to determine if there is sufficient evidence to support the trial court's ruling. (20) Because
the trial court is present to observe the venire member's tone and demeanor, we give great
deference to decisions made regarding venire members whose answers are vacillating, unclear, or
contradictory. (21)

 To show harm for the erroneous denial of a challenge for cause, the appellant must show
that the trial court's failure to strike a challengeable juror forced him to use a statutorily-allotted
peremptory strike on the challengeable juror, and thus the appellant was unable to strike another
objectionable juror who then sat on the jury. (22) Because the trial court in this case granted the
appellant two peremptory strikes in addition to his statutory allotment of 15, the appellant must
show that the trial court improperly denied three challenges for cause for panelists that the
appellant subsequently struck or tried to strike. (23)

B. Specific Challenges

1. "Mitigation Impaired"

 For most of the 18 challenged venire members, the appellant raises multiple issues.
Before addressing the appellant's complaints about specific venire members, we will first address
an issue that the appellant raises regarding nine of the venire members we discuss below, namely
that they were "mitigation impaired." (24) What the appellant seems to mean with this phrase is that
the venire members would be biased against the mitigation special issue. (25) One venire member,
Farmer, referred to mitigating circumstances as "excuses." Another, Early, could not think of
circumstances that would sufficiently mitigate against a death sentence for someone convicted of
capital murder. Seven other "mitigation impaired" venire members - Wharton, Mitchell, Smith,
Park, McLean, Genender, and Kilgore - said that they did not believe that particular factors
mentioned by the appellant, such as childhood poverty or war trauma, could ever sufficiently
mitigate against a death sentence for someone convicted of capital murder.

 Each of these nine said that they could listen to the mitigating evidence and answer the
special issues in accord with the law and the facts. There is no requirement that venire members
be able to think of sufficiently mitigating circumstances on their own, or that they find any
particular circumstance to be sufficiently mitigating. (26) We do not find the appellant's allegation
of "mitigation impairment" for any of these nine venire members to be evidence of a bias against
the law.

2. Farmer

 In his ninth point of error, the appellant argues that venire member Farmer was
"mitigation impaired," was biased against non-citizens, and had a job interview the day after voir
dire. The appellant presents no argument or authority for why the job interview would make
Farmer challengeable for cause, so we will not address that issue. (27) 

 On his juror questionnaire, Farmer stated that non-citizen participants in criminal trials -
defendants, victims, and witnesses - should be deported. When questioned, he stated his belief
that non-citizens were "a huge strain on our economy." However, he also stated that he would
give the same credibility to non-citizen witnesses as he gave citizen witnesses. The appellant has
failed to show that Farmer was impermissibly biased. We overrule point of error nine.

3. Winn

 In his tenth point of error, the appellant argues that venire member Winn was biased
against the defendant. Specifically, he points to two exchanges between Winn and defense
counsel during voir dire. 

 [COUNSEL]: So in a situation such as [when a child was murdered]  you think you
could not be fair in that kind of situation?

 [WINN]: It would be pretty tough.

 [COUNSEL]: Okay. And there is a difference between being pretty tough-

 [WINN]: Uh-huh.

 [COUNSEL]: [S]ome people will cross their arms and say  I don't care what's going
to be brought to me, if this is the situation that occurred, I am going to vote
for the death penalty every time. Do you think you might fall under that
category?

 [WINN]: Pretty much. If I heard he killed his child, I would-and I am not too crazy
about him killing his wife either. (28)


 In a later exchange, Winn said that her views on the death penalty were at least in part
influenced by her cousin, a prison guard. "I don't believe in [convicted capital murderers] sitting
in jail either and having another shot at my cousin." Her cousin had been "beat up a time or two,"
and Winn "guess[ed] that's part of the job." Defense counsel then asked Winn, "If you were me,"
would Winn want herself on the jury.

 [WINN]: I think you'd love to have me on your jury 'cause I'd try to be fair, but-

 [COUNSEL]: Okay. But do you-you do agree with me that-that-

 [WINN]: I do come in with some bias.

 [COUNSEL]: And that bias is toward the State.

 [WINN]: I would say so.


 A review of the entirety of Winn's voir dire shows that she gave contradictory answers
regarding her ability to set aside her prejudices and follow the law. She repeatedly stated that she
would listen to the evidence regardless of her predisposition. When she was asked about certain
mitigating factors, she did not reject them out of hand but instead said that she would "have to
hear more facts." She regarded her prejudices as not strong enough to prevent her from being a
fair judge of the facts.

 [WINN]: You know, you have prejudices against-you know-you hear something
and you go, oh, that's the worst thing in the world right there, and I just
hate that-

 [COUNSEL]: Absolutely-

 [WINN]: -you know, I hate that and I can't tolerate that, and,  I think we all start
off with those things. We come with our built-in ranges  of tolerance,
you know, and-but then there are the facts, so you have to hear the facts.

 

 The appellant has not shown that Winn could not overcome her bias well enough to
follow the law. (29) The trial court heard Winn's conflicting statements regarding her biases and
observed her demeanor, and we cannot conclude that the trial court abused its discretion in
denying the appellant's challenge. We overrule point of error ten.

4. Early

 In his eleventh point of error, the appellant argues that venire member Early would
automatically vote to assess the death penalty, could not consider the full range of punishment for
the lesser-included offense of murder, (30) was "mitigation impaired," and was biased against the
defendant because of a prior personal experience involving domestic violence. The argument that
Early was impermissibly biased because of her prior experience with domestic violence was not
presented to the trial court; therefore we will not address it. (31) 

 In response to a question of whether she would have an open mind during sentencing or
whether her mind would be made up after the guilt phase, Early responded:

 Well, I-I am assuming that it's made up. I mean, just flat-out he did it, he's guilty, he did
it just because he felt like it. Yeah, my mind's made up.  [H]e doesn't deserve to live.
But  it's kind of confusing without knowing exactly what happened, but it would be
kind of hard for me to say, you know, okay, no, now I don't think he deserves to die
because of the evidence that was presented to me. But if it was-so kind of like just what
is presented to me to make up my mind.


 Later, under questioning from the court, Early stated that she would answer the special
issues based upon the evidence presented to her. These responses thus vacillated between being
certain in the outcome and being open to future evidence.

 Early also gave contradictory statements as to whether she could consider the full range
of punishment for an individual convicted of non-capital murder. Under questioning by the State,
Early said that she could consider probation for a murder; under questioning from the appellant,
she said that she "would have to say no to probation"; under questioning from the court, she said
that she could consider probation.

 We begin by saying that we will defer to the trial court's reconciliation of these
contradictory statements. We add that, even if Early's statements amounted to a ground of
challenge for cause, the failure to excuse her would be harmless error because the ground went to
her ability to follow the laws on punishment for the lesser-included offense of murder, and the
jury's decision to convict for capital murder gave it no occasion to consider punishment for that
lesser-included offense. (32) We overrule point of error eleven.

5. Wharton

 In his twelfth point of error, the appellant argues that venire member Wharton was
"mitigation impaired," could not consider the full range of punishment for the lesser-included
offense of murder, would not give credibility to the testimony of psychologists and psychiatrists,
and "could not follow the law on intoxication." However, the appellant cites only to portions of
the record supporting his argument that Wharton was "mitigation impaired" and provides us with
no arguments for his other objections to Wharton. These arguments are insufficiently briefed and
we will not address them. (33) We overrule point of error twelve.

6. Mitchell

 In his thirteenth point of error, the appellant argues that venire member Mitchell would
automatically vote to assess the death penalty, was "mitigation impaired," and could not consider
the full range of punishment for the lesser-included offense of murder.

 As evidence that Mitchell was "an automatic death penalty individual," the appellant
quotes two portions of the record. In one, the State asked Mitchell what sort of cases he thought
"deserved" the death penalty:

 Well, multiple murders. Just what-what the judge read earlier, multiple murders,
murders while in the commission of other crime, grizzly [sic] murders. If I was
writing the law myself and had the power to do that, I'll guarantee you there
would be more to it than there is, but-but the law says grizzly-grizzly murders,
multiple murders, murder in commission of other crimes, and so forth and so on.


 The State then asked Mitchell how he would change the law if he were "governor for a
day." Mitchell did not offer specifics, but said that he thought "there are a lot of people that are
sitting in life terms and long terms that should have been taken out because they're not adding
anything to society." 

 Mitchell's statements do not show that he was so biased against the current law as to be
challengeable for cause. Mitchell told defense counsel, "I don't think the death penalty ought to
be automatic in any case." He said that he would answer the special issues based on the facts and
the law. The trial court was within its discretion not to dismiss Mitchell for being "an automatic
death penalty individual."

 The appellant's complaint that Mitchell could not consider probation for someone
convicted of the lesser-included offense of murder is not supported by the record. Defense
counsel explicitly asked Mitchell if he could consider probation on a murder case, and Mitchell
responded, "Yes, depending on circumstances-evidence." The appellant does not cite to any
place in the record where Mitchell contradicts this statement. We overrule point of error thirteen.

7. Smith

 In his fourteenth point of error, the appellant argues that venire member Smith would
automatically vote to assess the death penalty, was "mitigation impaired," would ignore the trial
court's instructions, and would not give credibility to psychologists and psychiatrists.

 The appellant cites several statements Smith made regarding her personal opinion on the
death penalty, asserting that these show she was "an automatic death penalty juror." However,
Smith repeatedly said that she would answer the special issues based on the law and the facts.
When the State summarized Smith's view by saying, "You're not going to run right out there and
give [the death penalty] to everybody just because you showed up in a murder trial; is that fair to
say?", she agreed: "That's fair." The trial court was within its discretion to deny the challenge
based on Smith being "an automatic death penalty juror."

 The appellant does not provide argument and record citations for his remaining
objections; therefore we will not address them. (34) We overrule point of error fourteen.

8. Park

 In his sixteenth point of error, the appellant argues that venire member Park was
"mitigation impaired," would automatically vote to assess the death penalty, and could not follow
the law regarding burdens of proof during the punishment phase. The appellant provides us
neither a citation to the record nor argument to support his objection that Park could not follow
the law regarding burdens of proof; therefore we will not address this issue. (35) 

 Under questioning from the State, Park said that those who murder children will always
be a continuing threat to society:

 There's no value for human life in that person, so their inclination to try to do that
again, their threshold, I think, has been reduced so much that  they could be a
threat to my children. They could be a threat to me. They could be a threat to
anyone  because there is this narcissistic lack of values.


 Park also said that he could not think of an instance where murdering a child would not
be a capital offense, and that after convicting a defendant of the capital murder of a child under
six years old, he would be predisposed to answer yes on the future-dangerousness special issue.

 However, when the State offered a hypothetical of a defendant, convicted of murdering a
child, who suffered a stroke and became physically incapacitated after the offense, Park agreed
that there may be "one-in-a-million" circumstances where child murderers were not continuing
threats. He said that he "wouldn't be making a snap decision," would give the defendant "the
benefit of the doubt," and consistently said that he would try to overcome whatever personal
biases he had. There is sufficient evidence to support the trial court's denial of the appellant's
challenge. We overrule point of error sixteen.9. Bolanos

 In his seventeenth point of error, the appellant argues that venire member Bolanos could
not speak English well enough to be a juror, indicated that he would not be fair, and did not want
to be a juror. 

 From the record it is clear that Bolanos regarded being a juror in a capital case as a
weighty matter, and stated that he would rather not be on a capital jury. However, he repeatedly
stated that he would sit on the jury and follow the instructions if that was his civic duty. The
appellant does not explain why these sentiments made Bolanos challengeable for cause. 

 While the record shows that English was Bolanos's second language, there is no support in
the record for the appellant's assertion that Bolanos could not speak English well enough to sit as
a juror. The record contains 53 pages of voir dire questions and answers between Bolanos and the
parties, all conducted in English. 

 The appellant seems to assert that a misunderstanding between defense counsel and
Bolanos regarding the nature of the special issues shows that Bolanos's English was insufficient
to allow him to be a qualified juror. However, this portion of the voir dire was contentious and
Bolanos was being uncooperative because he believed that defense counsel was "trying to make
[him] say" things he did not believe. Among other signs of conflict between Bolanos and defense
counsel, the trial court instructed defense counsel "not to throw the exhibits," and "not to pound
the exhibits." The trial court heard the voir dire and saw Bolanos's demeanor in the court room,
and we will defer to its determination of whether Bolanos's English was sufficient. 

 Bolanos also said that in a case involving the capital murder of a child, "I don't feel that I
would be qualified to be fair in that case, because I will be overwhelmingly  in favor of [the]
death penalty." However, after the State explained the law to him, Bolanos repeatedly said that he
could follow the law and answer the special issues based on the facts of the case. Defense counsel
repeatedly asked Bolanos whether he would automatically assess the death penalty, and Bolanos
maintained that he would follow the law and not prejudge the special issues. There is sufficient
evidence to support the trial court's denial of the appellant's challenge. We overrule point of error
seventeen.

10. LaGrassa

 In his eighteenth point of error, the appellant argues that venire member LaGrassa would
automatically vote to assess the death penalty and would give police officers more credibility than
other witnesses.

 The appellant points us to two exchanges to demonstrate LaGrassa's biases:


 [COUNSEL]: Under that situation where you've knowingly and intentionally
found an individual guilty of having killed two or more people-or two people.
Okay. Wasn't self-defense, wasn't defense of other, the person intended to do it,
meant to do it, right? Wasn't insane. In that situation your answer to Special Issue
Number 1 would always be yes.

 [LAGRASSA]: Yes.


Shortly thereafter, defense counsel posed the same hypothetical but added that the jury had
determined the offender posed a future danger.

 [COUNSEL]: So in that situation your answer to Special Issue Number 2 would
always be no, there would not be any mitigating circumstances, is that correct?

 [LAGRASSA]: That's correct.


 Elsewhere in his voir dire, however, LaGrassa gave conflicting answers. The first time
defense counsel posed a hypothetical regarding the mitigation special issue, LaGrassa said that he
would assess the death penalty only "[i]f there was no further evidence or no mitigating
circumstances." When the prosecutor described the special issues and told LaGrassa of the need to
wait until hearing evidence during the punishment phase before deciding the special issues, he
asked LaGrassa, "Could you, sir, keep an open mind and wait till you hear all the evidence and
then apply the law after you have done so?" LaGrassa responded, "Yes." Under questioning from
the court, LaGrassa said that he could keep an open mind and answer the special issues in accord
with the law and the facts. We will defer to the trial court's reconciliation of these contradictory
statements.

 For his argument that LaGrassa was impermissibly biased in favor of police, the appellant
refers us to LaGrassa's juror questionnaire, in which he said that prosecutors were "good guys,"
there needed to be more police officers, and defense attorneys were "bad guys." Elsewhere in the
record, LaGrassa provides vacillating statements on the issue of police credibility, finally
concluding that he would "probably [start a police witness] a little bit higher." A venire member is
not challengeable for cause because he is more or less skeptical of certain categories of witnesses,
so long as he does not hold extreme or absolute positions regarding credibility. (36) We overrule
point of error eighteen.

11. McLean

 In his nineteenth point of error, the appellant argues that venire member McLean would
give too much credibility to the testimony of police officers, was "mitigation impaired," would
automatically vote to assess the death penalty, and was biased against non-citizens.

 McLean stated that he would give police officers more credibility than other witnesses, but
also said that he would not automatically believe a police officer. A venire member is not
challengeable for cause because he is more or less skeptical of certain categories of witnesses, so
long as he does not hold extreme or absolute positions regarding credibility. (37) 

 The appellant's argument that McLean would automatically vote to assess the death
penalty is based on two statements. First, McLean said that sentencing capital murderers to life in
prison without the possibility of parole is a waste of money. However, McLean repeatedly stated
that he would follow the law, answer the special issues based on the facts, and not automatically
assess the death penalty. The trial court was within its discretion to believe that McLean could
follow the law despite the "waste of money" comment.

 Second, McLean stated that some crimes call for the death penalty regardless of whether
the offender has a history of violent conduct. This is not evidence of bias against the law; prior
violent behavior is not a requirement for a death sentence. (38)

 Regarding non-citizens, where the juror questionnaire asked how non-citizens should be
treated in the legal system, McLean wrote "Tried, guilt determination, and deportation." The
appellant claims this shows that McLean will always find non-citizens guilty. McLean denied this
interpretation during voir dire, and the trial court was within its discretion to believe McLean. We
overrule point of error nineteen.

12. Kilgore

 In his twentieth point of error, the appellant argues that venire member Kilgore would
automatically vote to assess the death penalty and was "mitigation impaired."

 To show Kilgore's bias in favor of the death penalty, the appellant cites an example of Kilgore
stating her "belief" that capital murderers "should" get the death penalty, and refers us to this
exchange:

 [COUNSEL]: Well explain to me what you mean when you say that you're probably
going to answer that Special Issue Number 1 yes.

 [KILGORE]: Okay, if-I agree if he-if it's being where I feel that it needs to be a
choice of life or death, then, yes, I would say yes-

 [COUNSEL]: Yes, you will-

 [KILGORE]: -to Special Issue 1.

 [COUNSEL]: Yes, you will always answer Special Issue Number 1 yes, is that
correct?

 [KILGORE]: Yes. Immediately before this exchange, Kilgore had repeatedly insisted that she "wouldn't
necessarily" answer yes on the first special issue, that she had "a right to change her mind" based
on the facts of the case, and was "not necessarily  just automatically saying they deserve the
death penalty." The trial court was within its discretion to believe her repeated pledges to answer
the special issues in accord with the law and facts. We overrule point of error twenty.

13. Roberts

 In his twenty-first point of error, the appellant argues that venire member Roberts would
automatically vote to assess the death penalty and would "shift the burden over to the Defense."

 To support his assertion that Roberts would automatically vote to assess the death penalty
in all situations, the appellant quotes an exchange in which Roberts expresses support for the
death penalty only in certain situations:

 [PROSECUTOR]: And in talking to you about the death penalty and whether you
are in favor of the death penalty, you put that you were in favor of the death
penalty, and you said, "If during the course of hearing the case I find that it's been
proven that the defendant is guilty and the crime justifies the individual being put
to death, I have no issues with deciding that the individual be put to death." Is that
still how you feel here today?

 [ROBERTS]: Yes.

 [PROSECUTOR]: Can you tell us a little bit why you feel that way?

 [ROBERTS]: Well, I've always felt that true justice is an eye-for-an-eye, and
unless you can give me a reason not to be basically eye-for-an-eye, then the person
deserves to die if they kill somebody.


 The appellant also suggests that this excerpt shows that Roberts would shift the burden to
the defense to prove that the defendant should not be executed. However, this was a statement of
Roberts's personal beliefs. Throughout his voir dire, Roberts stressed that regardless of his
personal beliefs he would answer the special issues in accord with the law and the facts. The trial
judge was within his discretion not to dismiss Roberts on for this reason. We overrule point of
error twenty-one.

14. Genender

 In his twenty-second point of error, the appellant argues that venire member Genender
would automatically vote to assess the death penalty and was mitigation impaired. The appellant
cites Genender's opinion regarding future dangerousness: "I don't see how  you can convict
someone of capital murder at the guilt phase and not immediately have some feelings about, oh,
this person might be  a danger to society." 

 Immediately following that statement, though, Genender explained that whatever
presumption he would have after the end of the guilt phase would not, by itself, be sufficient to
answer yes on the first special issue. He insisted that the State would still have the burden of
proof, and that he would follow the law and answer the special issues according to the facts. 

 The appellant also directs us to another lengthy exchange in which Genender says that "to
the extent [his] passions would be inflamed about a capital crime," it would be one that involved
children. "[W]ould I be the best juror for that case? No, I don't think I would be.  I would hear
that evidence and it would make me angry at a gut level beyond rational thought." Genender said
that his emotions might be so inflamed that he "possibly" might automatically vote for the death
penalty in a child murder case.

 Genender said repeatedly, however, that he would try to follow the law and set aside his
emotions, and (as we have said above) that he would follow the law and base his verdict on the
facts. The trial court was present to observe his demeanor and listen to the tone of his answers,
and its determination that Genender was not impermissibly biased is entitled to great deference.
We overrule point of error twenty-two.

15. Fletcher

 In his twenty-third point of error, the appellant argues that venire member Fletcher would
automatically vote to assess the death penalty. Additionally, the appellant argues that "[d]ue to a
fire alarm going off at the court house, Defense Counsel was unable to continue questioning"
Fletcher, thus denying the appellant due process.

 Fletcher said she "believes" that if two children are murdered, the offender should
"definitely" be executed. However, immediately after that statement, Fletcher insisted that she
would answer the special issues in accord with the law and the facts, and that she would not
automatically vote for the death penalty: "But if the evidence doesn't prove that he should die, he
shouldn't." The trial court was within its discretion not to dismiss Fletcher on this ground.

 The record does not support the appellant's assertion that a fire alarm stopped Fletcher's
voir dire. Rather, the trial court cut off defense counsel for badgering the witness. The only
mention of a fire alarm in the record occurred only after Fletcher answered what the trial court had
announced was the appellant's last question. The appellant provides us with no argument for why
this violated due process. We overrule point of error twenty-three.

16. Chavoya

 In his twenty-fourth point of error, the appellant argues that venire member Chavoya
would automatically assess the death penalty for an offender convicted of the capital murder of a
child. 

 The appellant cites statements from Chavoya that imply an inability to follow the law.
Chavoya responded affirmatively when asked whether an offender convicted of the capital murder
of two people would always be a future danger. A short time later, Chavoya also said that if the
capital murder is "always proven without a doubt," he would answer yes on the future
dangerousness special issue "every time in that situation." However, Chavoya hedged both of
these statements, immediately following up his categorical declarations with caveats that "every
situation is different," stating that he would need to "hear all the evidence," and that his answer
might be different if there were "variances" in the situation. 

 Similarly, Chavoya said that in the cases of the capital murder of a child or of two or more
people, he would not consider mitigating circumstances. Yet, when defense counsel gave him a
hypothetical where he was on a jury that had convicted an offender of the capital murder of two
people, Chavoya listed several mitigating factors he would look for and said that mitigation
"would be important to me."

 Under questioning from the court, Chavoya said that he would answer the special issues in
accord with the law and the facts. In light of the contradictory answers Chavoya gave, the trial
court did not abuse its discretion in denying the appellant's challenge for cause. We overrule point
of error twenty-four.

17. Fitzgerald

 In his twenty-sixth point of error, the appellant argues that juror Fitzgerald would not
consider the full range of punishment for the lesser-included offense of murder. The appellant
cites the following exchange:

 [COUNSEL]: And the range of punishment is anywhere from five years to 99
years or life, and in this case, the possibility of community service or probation
could be assessed if-whatever the jury felt. Is your mind open to the full range of
punishment is that the situation?

 [FITZGERALD]: Is my mind open? My mind would probably-yes, my mind
would be open to a lot of things, but the fact that you included community service
and-and-you specifically said a murder, I don't think so. 

 [COUNSEL]: Okay.

 [FITZGERALD]: My mind would not be open to that. 


 A venire member who cannot consider the full range of punishment for any offense of
which the accused might be found guilty is challengeable for cause. (39) However, community
service is not a possible punishment for murder. Community service is available only in a case in
which the punishment is confinement in a county jail, (40) which is not a possible punishment for
murder. Thus Fitzgerald's refusal to consider it is not evidence of bias against the law applicable
to this case, in which the possible punishments were only death or confinement in prison. During
an earlier discussion with the State, Fitzgerald had said that she was open to the full range of
punishment for murder, including probation (which was the former statutory term, and which is
still informally used, for what statutes now call "community supervision.") (41)

 Later, the appellant asked Fitzgerald, based on the indictment for this case but presuming
the jury convicted of murder instead of capital murder, whether she could consider the full range
of punishment. Having seen the indictment, which specified that two people had been killed,
Fitzgerald said she could not. A venire member is not challengeable for refusing to consider the
full range of punishment after being presented with specific facts of a case. (42) We overrule point of
error twenty-six.

18. Venire Members Pierot and Mathew

 Because the appellant must show that the trial court erroneously denied at least three
challenges for cause in order to be entitled to relief, (43) we need not address the appellant's
remaining two points of error regarding venire members Pierot and Mathew. We overrule points
of error fifteen and twenty-five.

C. Constitutional Challenges to the Jury

 In his twenty-seventh and twenty-eighth points of error, the appellant asserts that "the jury
as constituted was biased or prejudiced which deprived appellant of a fair trial" in violation of
"the United States Constitution" and Article I, Section 10 of the Texas Constitution. He asserts
that the statutory voir dire errors he complained of are also constitutional errors. The appellant
provides us with no authority for these propositions. Having found no error in voir dire, we
overrule these points of error.

D. The State's Challenges for Cause

 In his twenty-ninth point of error, the appellant asserts that the trial court erred in dismissing
three venire members that the State challenged for cause. However, the erroneous granting of a
challenge for cause will result in a reversal only if the record shows that the error deprived the
defendant of a lawfully constituted jury. (44) The record does not show this. We overrule point of error
twenty-nine.

III. Ineffective Assistance

 In points of error thirty and thirty-one, the appellant complains that he was denied effective
assistance of counsel in violation of the Sixth Amendment. (45) He contends that his counsel was
ineffective "since no mitigation evidence was presented to the jury."

A. Standard of Review

 The normal test for ineffective-assistance claims is that established in the Strickland case,
which requires the appellant to show that (1) counsel's performance fell below an objective
standard of reasonableness, and (2) but for counsel's unreasonable actions or inactions, there is a
reasonable probability that the result of the proceeding would have been different. (46)

 Instead of using this standard Strickland analysis, the appellant argues that this case should
be judged under the standard announced in United States v. Cronic. (47) Handed down by the
Supreme Court the same day as Strickland, Cronic dealt with a case where the defense counsel did
not participate in any part of the trial. In such a situation, where counsel "entirely fail[ed] to
subject the prosecution's case to meaningful adversarial testing," courts should presume prejudice
rather than going through the second part of the Strickland analysis. (48) However, because the only
portions of the appellant's trial that defense counsel did not participate in were presenting
punishment evidence and presenting a jury argument during the punishment phase (49) we believe
that counsel's failure, if any, was not "entire," and thus Strickland, not Cronic, controls our
analysis. (50)

B. Background

 Trial began on Monday, September 8, 2008. The State presented evidence of guilt for three
days, and then on Wednesday, September 10, the jury was sent home until the following Monday
in order to accommodate a juror's previously-planned fishing trip. When trial resumed on
Monday, September 15, the State finished presenting its guilt evidence, and the defense rested
without presenting any guilt evidence. After a short deliberation, the jury returned a guilty verdict.
That same day, the State presented two witnesses for punishment evidence and rested on the issue
of punishment.

 After court recessed for the day, a juror fell down some steps at the courthouse and
severely injured her arm. Further complicating the trial at this point, the trial court, unbeknownst
to the parties, had told another juror that there would be no trial on Wednesday, September 17, or
Thursday, September 18, in order to allow that juror to travel to Lubbock and attend the induced
birth of his grandchild. In light of these events, on Tuesday, September 16, the trial court recessed
for one week to allow the injured juror to recover and the Lubbock-bound juror to complete his
trip.

 When the trial court announced this decision, defense counsel objected. The defense had
planned to present eleven witnesses over three days, with several witnesses flying in from out of
state and the appellant's mother, brother, and grade-school teacher flying in from El Salvador.
Defense counsel insisted that they were prepared to begin their case that morning, and that it
would be difficult to arrange to have all of the defense witnesses back in Dallas the next week.
The appellant asked the trial court to replace the injured juror with the alternate, restrain the
Lubbock-bound juror from leaving town, and to proceed with the trial that day. The trial court
denied this request.

 In the following weeks, the trial court would attempt to reschedule the trial no less than
three times. Finally, the court established Monday, October 27 as the date for trial to resume,
despite the appellant's insistence that his main witness, Dr. Ricardo Weinstein, could not be
present that week. The appellant insisted that Dr. Weinstein had a prior commitment assisting the
defense in a death-penalty case in North Carolina and would not be available until late January,
2009. 

 When trial resumed on October 27, Dr. Weinstein was not present, (51) and the lead defense
counsel, Donna Winfield, advised the court that she would not call any witnesses without Dr.
Weinstein's testimony being first. Winfield also refused to rest her case, attempting to get the trial
court to reconsider a motion for continuance she had made the prior week. Even after the trial
court had her arrested for contempt, Winfield refused to participate in the proceedings. After
releasing Winfield from custody and confirming that she would not call any witnesses, the trial
court recalled the jury and advised them that "you have heard all the evidence that you're going to
hear . . . in this matter."

 The next morning, October 28, Winfield refused to respond when asked whether the
appellant had any objections to the jury charge. After the court read the charge to the jury, the
court asked whether the appellant wanted to present an argument.

 MS. WINFIELD: Your Honor, based on the rulings of the Court, my client-

 THE COURT: Stop. It's just a yes or no. You've got a right to make an argument
or not make an arguments [sic]. Not give a speech to me. Either-you have a right
the [sic] make an argument or not make an argument.

 MS. WINFIELD: My client has been deprived of effective assistance of counsel
and-

 THE COURT: Alright [sic]. Stop. Stop.

 MS. WINFIELD: I cannot do that.

 THE COURT: All right. State?


The State then presented its jury argument, and the jury was sent to deliberate. The jury soon
returned, answering yes to the future-dangerousness special issue, and no to the mitigation special
issue. The court asked whether there was any legal reason it could not sentence the appellant, to
which Winfield responded, "I can't proceed, Judge." The court then sentenced the appellant to
death. 

C. Analysis

 The appellant does not complain about specific actions or inactions of his counsel, but
instead points us to defense counsel's failure to present punishment evidence and asserts that "in
these circumstances, prejudice to the defense is irrefutabl[y] presumed."

 The appellant presents us with no argument as to which witnesses his counsel should have
called. It is plain from the record that defense counsel considered Dr. Weinstein to be the crux of
their punishment case. However, the fact that defense counsel did not call Dr. Weinstein to testify
cannot be the basis of an ineffective assistance claim because the appellant has made no showing
that Dr. Weinstein was available to testify. (52) In the hearings leading up to the October 27 trial
date, on October 27 itself, and during the motion for new trial hearing that occurred in December,
defense counsel consistently maintained that Dr. Weinstein was not available because he was
assisting the defense at the North Carolina trial. 

 Strickland does not require defense counsel to present mitigating evidence in every case. (53)
By not specifying what evidence his counsel should have presented, the appellant has failed to
present a basis to conclude that defense counsel's decision not to present evidence was
unreasonable, or that there is a reasonable probability that the result would have been different.
Points of error thirty and thirty-one are overruled.

IV. Trial Scheduling

 In points of error thirty-two through thirty-five, the appellant complains about decisions
that the trial court made in setting trial dates.

A. Motions for Continuance

 On October 20, the appellant filed a written, sworn motion for continuance, stating that
neither Dr. Weinstein nor Richard McGough-an investigator who helped assemble mitigation
evidence but whom the appellant did not intend to call as a witness-was available on October 27.
At various hearings over the next week, the appellant repeatedly reurged this motion for
continuance, and filed another motion for continuance on October 27. In his thirty-third point of
error, the appellant alleges that the trial court erred in denying these motions.

 We review a trial court's denial of a mid-trial continuance on an abuse of discretion
standard. (54) The October 20 motion for continuance makes no mention, as required by statute, of
"[t]he diligence which has been used to procure [the witness's] attendance." (55) Indeed, testimony
during the new trial hearing shows that there was no diligence on the part of the appellant to
procure Dr. Weinstein's presence at the October 27 trial setting. The appellant refused several
offers by the trial court to attach Dr. Weinstein. (56) A trial court does not abuse its discretion when
it denies a motion for continuance that does not meet statutory requirements. (57) 

 The October 27 motion for continuance requested a delay in order to obtain the presence
of Dr. Weinstein as well as the appellant's mother and brother. This motion stated that the
"[d]efense has taken all necessary steps to procure their appearance by contacting them or a
representative, and inform[ing] them of the court date and their need to appear." This conclusory
statement is insufficient to meet the statutory requirements for a showing of diligence, thus this
motion was facially deficient and the trial court did not abuse its discretion in denying it. (58)

 Because there was no error in overruling these motions, there was also no error, as alleged
in point of error thirty-four, in denying the appellant's motion for new trial based on the motions
for continuance. Points of error thirty-three and thirty-four are overruled.

B. Due Process

 In his thirty-second and thirty-fifth points of error, the appellant complains that he was
denied due process of law by the scheduling decisions of the trial court. In both points of error, the
appellant faults the trial court for stopping the trial on September 15, when his witnesses were
present, and for restarting the trial on October 27, when "the defense's family and expert
witnesses could not be in attendance."

 The trial court stopped the trial on September 15 because there was one juror who was
physically incapacitated, and another who had told the judge that he would not be able to focus on
the trial unless he was allowed to attend the birth of his grandchild on September 16 in Lubbock.
The appellant provides no argument for why this "arbitrary delay" was a violation of due process,
rather than being a proper use of the trial court's inherent authority to control the trial.

 Even if a denial of a motion for continuance results in a defendant presenting no evidence,
this does not necessarily violate due process. (59) There is no mechanical test for determining
whether a denial of a continuance violates due process; rather, each case will be considered
individually. (60) Here, the appellant made no showing to the trial court that he diligently attempted
to secure the presence of his witnesses, and the full record reveals that there was indeed no
diligence. The appellant's right to due process was not violated by the trial court's refusal to grant
a continuance. Points of error thirty-two and thirty-five are overruled.

V. Mental State Evidence

 During the guilt phase of the trial, the appellant sought to introduce testimony to support a
theory that the appellant lacked the culpable mental state of intent or knowledge. Points of error
thirty-six through thirty-eight complain of how that evidence was treated by the trial court

A. Background

 The appellant's theory came from Dr. Weinstein, who summarized his potential testimony
during a defense proffer:

 [F]eelings and emotions interfere in our every day functioning.  [A]t the time
that Mr. Medina committed this tragic event, he was not aware of the separation
between himself and his children because of the way the emotions affect him and
the circumstances [that] led to those emotions. And in reality he committed suicide
and because  the children were an extension of himself, that's what led to the
death of the children. It was a self destruction act that included what he perceived
as an extension of himself.


The appellant also proffered that he would present lay witness testimony showing that he was
distraught and suicidal in the days leading up to the murders. 

 During a lengthy discussion with the State and the court, the appellant argued that the
testimony would allow the jury to convict either for the lesser-included offense of murder, (61) or
manslaughter. (62) The court, however, believed that the evidence would go only toward negating the
required mental state for capital murder, thus moving the jury to acquit altogether. The court ruled
that the evidence was admissible, but that it would not entitle the defense to lesser-included
offense charges. The defense then chose not to present the evidence but to reserve it for the
punishment phase.

B. Admission of Evidence

 In point of error thirty-six, the appellant complains that:

 The trial court erred in holding, as a matter of law, that Texas law does not allow
evidence of the defendant's mental impairment in determining whether the State
proved the required culpable mental state beyond a reasonable doubt in the
guilt/innocence state of the trial.


 The record does not show such a ruling by the trial court. Although the trial court
originally ruled the evidence inadmissible, later in the hearing the State dropped its objection and
the trial court ruled that the testimony was admissible for the purpose of challenging the State's
proof regarding the appellant's mental state. The trial court allowed the evidence, and the
appellant seeks no additional relief in this point of error. Point of error thirty-six is overruled.

 In point of error thirty-seven, the appellant complains that Dr. Weinstein's testimony
should have been admitted "on the issue of diminished capacity." Texas law does not recognize
diminished capacity as an affirmative defense. (63) This point of error is overruled.

C. Ineffective Assistance of Counsel

 In point of error thirty-eight, the appellant asserts that his counsel was ineffective for
failing to call Dr. Weinstein to testify during the guilt phase. After the trial court ruled that Dr.
Weinstein could testify, the appellant's counsel quite explicitly made a "declaration of a strategic
decision" not to have Dr. Weinstein testify. Defense counsel thought the State "would be able to
question Dr. Weinstein in front of the jury regarding potential extraneous offenses against the
defendant, which [she] believe[d] would be highly prejudicial." Defense counsel stated that Dr.
Weinstein would be best used during the punishment phase.

 Trial counsel's decisions regarding trial strategy, even if they fail, do not constitute
ineffective assistance of counsel unless they fall below an objective standard of reasonableness. (64)
The decision not to call a witness out of fear that extraneous offenses will be introduced during
cross-examination is reasonable. (65) Point of error thirty-eight is overruled.

VI. Autopsy Photographs

 In point of error thirty-nine, the appellant complains that the trial court erred by admitting
16 prejudicial photographs of the victims. He contends that the number of photographs was
excessive, and the probative value of the photographs was minimal because the medical examiner
testified regarding the wounds.

A. Standard of Review

 The admissibility of a photograph is within the sound discretion of the trial judge. (66)
Generally, a photograph is admissible if verbal testimony as to matters depicted in the
photographs is also admissible. (67) If there are elements of a photograph that are genuinely helpful
to the jury in making its decision, the photograph is inadmissible only if the emotional and
prejudicial aspects substantially outweigh the helpful aspects. (68)

 A court may consider many factors in determining whether the probative value of evidence
is substantially outweighed by the danger of unfair prejudice. These factors include: the number of
exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and
white, whether they are close-up, and whether the body depicted is clothed or naked. (69) 

B. Analysis

 There are eight photographs of each victim: one showing the victim fully clothed on an
autopsy table, one showing the victim nude on the autopsy table, and closeups of each victim's two
entrance and two exit wounds. The photographs are not repetitive, and each has a different focus from
the others. The photographs are no worse than would be expected in this sort of crime. The only
alteration to the bodies is that portions of the victims' hair have been shaved to show the wounds. The
photographs are 8.5" x 11" and in color. 

 The photographs were used during the medical examiner's testimony to help explain the
nature of the wounds. We cannot find that the probative value of these photographs was substantially
outweighed by their prejudicial effect. Point of error thirty-nine is overruled.

VII. Motion to Recuse

 On the morning of October 27, the appellant filed a motion to recuse the trial judge, the
Honorable Andy Chatham, based on Rule of Civil Procedure 18a (70) and Article 30.01 of the Code
of Criminal Procedure. (71) The motion purported to show that Judge Chatham was impermissibly
biased against the defense, and had "acted as an adversary rather than a jurist. . . . Judge Chatham
is no longer acting as a disinterested jurist but rather a disrupting and corrupting force." At a
hearing before the district's presiding judge, the Honorable John Ovard, Winfield testified
regarding Judge Chatham's scheduling decisions and his attempts to contact the appellant's
witnesses to determine their availability. In his fortieth point of error, the appellant argues that
Judge Ovard erred in overruling the motion to recuse.

 Both the motion and Winfield's testimony were based on the appellant's objections to the
court dates that Judge Chatham set and his rulings that went against the appellant. During cross-examination, the State asked Winfield what specific extra-judicial bias she could point to.
Winfield responded that "[her] motion speaks for itself." 

 A trial judge must be recused if a reasonable person, knowing all the circumstances
involved, would harbor doubts as to the impartiality of the trial judge. (72) We review a denied
motion to recuse for abuse of discretion, (73) and we will not reverse the trial judge's decision so
long as the ruling was within the zone of reasonable disagreement. (74) The appellant has shown us
no evidence of actual bias, and thus has not persuaded us that Judge Ovard abused his discretion.
Point of error forty is overruled.

VIII. Previously Decided Issues

 In points of error forty-one through fifty-three, the appellant presents us with 12 issues
already decided by this court, and invites us to review our prior stands.

 In point of error forty and forty-one, the appellant asks us to review the jury's verdict
regarding the mitigation special issue. Because the jury's answer to this question is inherently
subjective, we do not review the answer for sufficiency of the evidence. (75)

 In point of error forty-five, the appellant argues that article 37.071 of the Code of Criminal
Procedure, which establishes Texas's capital-sentencing procedures, violates the Fifth and
Fourteenth Amendments to the Federal Constitution, as well as Article I, Sections 13 and 19 of
the Texas Constitution. The appellant's federal claim hinges on his interpretation of Bush v.
Gore, (76) an argument that we have previously rejected. (77) The appellant presents us with no
arguments in his brief as to why the provisions of the Texas Constitution he cites provide broader
protections than equivalent provisions in the Federal Constitution, and we have previously
rejected the arguments he made to the trial court. (78)

 Points forty-three, forty-four, and forty-six through fifty-three are identical to those
presented to this Court by the same counsel in Saldano v. State. (79) As we did in Saldano, we shall
"decline appellant's invitation to review our prior decisions." (80) Points of error forty-one through
fifty-three are overruled.

 We affirm the judgment and sentence of the trial court.


Delivered January 12, 2011.

Do not publish.
1. Tex. Code Crim. Proc. art. 37.071 § 2(b)(1), (e)(1). 
2. See id., at § 2(h) ("The judgment of conviction and sentence of death shall be subject to automatic review by
the Court of Criminal Appeals.").
3. See Batson v. Kentucky, 476 U.S. 79 (1988); see also Powers v. Ohio, 499 U.S. 400, 415-16 (1991) (granting
defendants standing to raise equal-protection claims regardless of whether they are of the same race as the stricken
panelists).
4. Purkett v. Elem, 514 U.S. 765, 767 (1995).
5. Gibson v. State, 144 S.W.3d 530, 534 (Tex. Cr. App. 2004).
6. Id. 
7. The State also struck the only other venire member under 30, a white male. See U.S. v. Maxwell, 160 F.3d
1071, 1075-76 (6th Cir. 1998) (noting that the Supreme Court has never held that age is an illegitimate reason to strike
jurors).
8. See Jasper v. State, 61 S.W.3d 413, 422 (Tex. Cr. App. 2001) (venire member's responses to a written
questionnaire can be valid grounds for a peremptory challenge).
9. See, e.g., Watkins, 245 S.W.3d at 448-49; Keeton v. State, 749 S.W.2d 861, 868 (Tex. Cr. App. 1998).
10. Reed v. Quarterman, 555 F.3d 364, 376 (5th Cir. 2009).
11. The name is also spelled "Greenhaw" at different points in the record.
12. Johnson v. California, 545 U.S. 162, 170 (2005). 
13. See Soria v. Johnson, 207 F.3d 232, 237 (5th Cir. 2000) (where defendant objected to strikes on Batson
grounds, but the trial court refused to force the prosecution to give race-neutral reason for strikes, trial court's decision
"should be treated as a finding that [the defendant] failed to make a prima facie case of discrimination under Batson");
see also Wamget v. State, 67 S.W.3d 851, 858-59 (Tex. Cr. App. 2001) (holding that establishing the venire member's
race, understood as ancestral line and ethnicity, is a burden of the party alleging purposeful discrimination, and that "the
party alleging discrimination based on nationality or ethnicity under Batson will not adequately establish the
venireperson's ethnicity and cognizable racial group by showing only the country of their birth, and such party will
likewise fail to meet its burden of persuasion of race discrimination by showing that the peremptory strike was based only
on the country of the venireperson's birth.").
14. The appellant's brief incorrectly says, "No reasons were presented as to why the State struck Mr. Greenhauf."
15. Hernandez v. New York, 500 U.S. 352, 359 (1991). 
16. Of the 47 qualified venire members, the appellant objected to 37, including, among others, every juror who
was empaneled, the alternate juror, and three venire members who were peremptorily struck by the prosecution and
whose strikes the appellant now complains about under Batson.
17. Tex. Code Crim Proc. art 35.16. See Sadler v. State, 977 S.W.2d 140, 142 (Tex. Cr. App. 1998)
(interpreting "bias against the law" to mean "refusal to consider or apply the relevant law").
18. Threadgill v. State, 146 S.W.3d 654, 667 (Tex. Cr. App. 2004). 
19. Feldman v. State, 71 S.W.3d 738, 747 (Tex. Cr. App. 2002).
20. Id., at 744.
21. Id.
22. Saldano v. State, 232 S.W.3d 77, 91 (Tex. Cr. App. 2007).
23. Id. 
24. Both the appellant and the State use this phrase as a term of art.
25. See Tex. Code Crim. Proc. art. 37.071(e)(1). 
26. See, e.g., Threadgill v. State, 146 S.W.3d 654, 668 (Tex. Cr. App. 2004); Standefer v. State, 59 S.W.3d 177,
181 (Tex. Cr. App. 2001) (also noting, "whether a juror considers a particular type of evidence to be mitigating is not
a proper area of inquiry"); see also Raby v. State, 970 S.W.2d 1, 3 (Tex. Cr. App. 1998).
27. See  Tex. R. App. P. 38.1(i).
28. Winn originally believed that she had been summoned for a case she had heard about in which a man was
charged with killing his wife and child.
29. See Feldman, 71 S.W.3d at 747. 
30. The lesser-included offense was not submitted to the jury.
31. See Tex. R. App. P. 33.1(a)(1).
32. See King v. State, 953 S.W.2d 266, 268 (Tex. Cr. App. 1997) (citing precedents).
33. See  Tex. R. App. P. 38.1(i).
34. See  Tex. R. App. P. 38.1(i).
35. See id.
36. Feldman, 71 S.W.3d at 747.
37. Id.
38. See Tex. Pen. Code § 19.03.
39. Ladd v. State, 3 S.W.3d 547, 559 (Tex. Cr. App. 1999).
40. See Tex. Code Crim. Proc. art. 42.036(a).
41. See id., art. 42.12.
42. Sadler v. State, 977 S.W.2d 140, 143 (Tex. Cr. App. 1998).
43. See Saldano, 232 S.W.3d at 99. 
44. Jones v. State, 982 S.W.2d 386, 394 (Tex. Cr. App. 1998).
45. The appellant's appellate counsel was also a member of his trial team; additionally, his lead counsel at trial
presented oral argument to this Court.
46. Strickland v. Washington, 466 U.S. 668, 687 (1984). 
47. 466 U.S. 648 (1984).
48. Id., at 658-59; Cannon v. State, 252 S.W.3d 342, 348-49 (Tex. Cr. App. 2008).
49. Defense counsel presented an opening statement and a jury argument during the guilt phase, reviewed the jury
charge during the guilt phase, and cross examined all of the State's witnesses during the guilt phase and during the
punishment phase.
50. See Bell v. Cone, 535 U.S. 685, 696-97 (2002) (where the only portions of a trial in which defense counsel
did not participate were presenting punishment evidence and a jury argument during the punishment phase, Strickland,
not Cronic, applied). 
51. Dr. Weinstein had been sworn in as a witness for a voir dire hearing on September 15. At several on-the-record hearings during the six-week recess, the trial court asked the appellant whether he wanted to attach Dr. Weinstein.
Not until trial resumed on October 27 did the appellant request an attachment. The trial court denied the request when
it decided to close the punishment evidence.
52. See Ex Parte Ramirez, 280 S.W.3d 848, 853 (Tex. Cr. App. 2007) (For this court to find that counsel was
ineffective for not calling a witness, the appellant "must show that [the witness] had been available to testify and that his
testimony would have been of some benefit to the defense.").
53. Wiggins v. Smith, 539 U.S. 510, 533 (2003).
54. Vasquez v. State, 67 S.W.3d 229, 240-41 (Tex. Cr. App. 2002)
55. Tex. Code Crim. Proc. art. 29.06; see also Gentry v. State, 770 S.W.2d 780, 786-87 (Tex. Cr. App. 1988)
(applying Article 29.06 requirements to motions for continuance made during the course of trial under Article 29.13). 
56. Winfield testified that she was concerned that if Weinstein were forcibly removed from the North Carolina
trial, he would be upset and not make a good witness. "[Expert witnesses'] mind set[s] and their egos have to be
assuage[d], and their-I don't want to make it sound as though they're children, but in some respects they [are] . . . [T]o
tak[e] a potential expert witness out of a trial that they're immersed in and force them to come back . . . to another trial
would have been counter productive to our defense." She was also concerned that removing Dr. Weinstein to Dallas
would cause problems for the defense in the North Carolina case. Dr. Weinstein was a consulting expert for the North
Carolina defendant, and was a potential rebuttal witness. However, he was not subpoenaed and did not testify during that
trial.
57. Gentry, 770 S.W.2d at 786-87.
58. During the new trial hearing, Winfield stated that she had done nothing whatsoever to procure the presence
of the appellant's mother and brother for the October 27 court date. 
59. Ungar v. Sarafite, 376 U.S. 575, 589-90 (1964). 
60. Id.
61. See Tex. Pen. Code § 19.02(b)(2) ("A person commits an offense if he intends to cause serious bodily injury
and commits an act clearly dangerous to human life that causes the death of an individual.").
62. See Tex Pen. Code § 19.02(d), reducing murder to a second degree felony if the defendant proves he
committed the murder under the immediate influence of sudden passion arising from an adequate cause. While this is
still murder, the degree of the offense would be the equivalent of manslaughter, also a second-degree felony, and the
appellant referred to the reduced-punishment murder as "manslaughter." The appellant specifically requested that, if this
evidence were admitted, the jury be charged with manslaughter as described in Penal Code § 19.04. 
63. See Ruffin v. State, 270 S.W.3d 586, 591-96 (Tex. Cr. App. 2008); Jackson v. State, 160 S.W.3d 568, 573-74
(Tex. Cr. App. 2005).
64. Strickland, 466 U.S. at 687-88.
65. Ex parte McFarland, 163 S.W.3d 743, 757-58 (Tex. Cr. App. 2005).
66. Gallo v. State, 239 S.W.3d 757, 762 (Tex. Cr. App. 2007). 
67. Id. 
68. Erazo v. State, 144 S.W.3d 487, 492-93 (Tex. Cr. App. 2004); see Tex. R. Evid. 403. 
69. Wyatt v. State, 23 S.W.3d. 18, 20 29 (Tex. Cr. App. 2000).
70. This rule allows recusal motions based on "any disability of the judge to sit in the case." See also Arnold v.
State, 853 S.W.2d 543, 544 (Tex. Cr. App. 1993) (Rule of Civil Procedure 18a applies to criminal cases).
71. "No judge or justice of the peace shall sit in any case where he may be the party injured, or where he has been
of counsel for the State or the accused, or where the accused or the party injured may be connected with him by
consanguinity or affinity within the third degree, as determined under Chapter 573, Government Code."
72. Kemp v. State, 846 S.W.2d 289, 305 (Tex. Cr. App. 1992). 
73. Tex. R. Civ. P. 18a(f).
74. Kemp, 846 S.W.2d at 306.
75. Fuentes v. State, 991 S.W.2d 267, 280 (Tex. Cr. App. 1999); Green v. State, 934 S.W.2d 92, 107-07 (Tex.
Cr. App. 1996).
76. 530 U.S. 98 (2000).
77. Busby v. State, 253 S.W.3d 661, 667 (Tex. Cr. App. 2008); Threadgill v. State, 146 S.W.3d 654, 671-72
(Tex. Cr. App. 2004).
78. See Brooks v. State, 990 S.W.2d 278, 288-89 (Tex. Cr. App. 1999) (holding that the distinction between
"cruel and unusual" and "cruel or unusual" is not obviously important, and adding: "To adequately brief a state
constitutional issue appellant must proffer specific arguments and authorities supporting his contentions under the state
constitution").
79. 232 S.W.3d, at 100-08. In that case, they were points 19, 25, 51, 52, 54, 56, 57, 58, 59, and 61.
80. Id., at 108-09.